Thomas M. Hanson, Bar No. 184465
hanson@loevy.com
David B. Owens, Bar No. 275030
david@loevy.com
Jon Loevy, *pro hac vice*
jon@loevy.com
Mike Kanovitz, *pro hac vice*
mike@loevy.com
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)

*Attorneys for Plaintiffs and Interim Class Counsel*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD LEWIS, GLADYS SOLIS, and PATRICIA CASTILLO, individually and on behalf of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>MAGNITE, INC.,<br><br>Defendant. | Case No. 2:25-CV-03448-MWC-SSC<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"), THE CALIFORNIA CONSTITUTION, INTRUSION UPON SECLUSION, UNJUST ENRICHMENT, AND VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>**<br><br>Judge: Hon. Michelle Williams Court |

## INTRODUCTION

1. Plaintiffs Edward Lewis, Gladys Solis, and Patricia Castillo, on behalf of themselves and a nationwide Class and California Subclass of similarly situated individuals, ("Class Members"), bring this action for damages and injunctive relief against Magnite, Inc. ("Magnite") for violations of the California Invasion of Privacy Act ("CIPA"), California Penal Code § 630, et seq., including Section 631 in relation to the unauthorized collection, recording, and dissemination of Plaintiffs' and Class members' personal information, geolocation data, and communications, and Section 638.51 in relation to Defendant's use of "pen register" and "trap and trace" tracking software on Plaintiffs' mobile devices in violation of federal law. Plaintiffs also bring claims for Magnite's violations of their Right to Privacy enshrined in the California Constitution, intrusion upon seclusion, unjust enrichment, and violations of the federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*. Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain to Plaintiffs, or to Plaintiffs' counsel, which Plaintiffs allege on their personal knowledge or based on investigation of counsel.

## NATURE OF THE CASE

2. Thousands of data brokers in the United States buy, aggregate, disclose, and sell billions of pieces of consumers' private information with virtually no oversight. Such companies have enormous financial incentives to collect consumers' personal data, and little financial incentive to protect consumer data. For these companies, consumers are the product, not the customer.

3. Magnite is one such company. Magnite is a registered data broker in California and an ad bidding agency that profits from ad-space sellers (e.g., websites and mobile apps) selling their ad space to advertisers.

4. Magnite adds value to digital ad space by collecting private information about the website or app user, which the advertisers can then use to target their ads to more likely customers.

5. To further its collection of consumers' private information, Magnite has developed a proprietary online tracker known as the Rubicon Tracker.

6. The Rubicon Tracker uses both an API (application programming interface) and an SDK (software development kit) for non-web-based applications (e.g., mobile phone applications). Via the Rubicon Tracker, Magnite collects a wealth of information about consumers and their mobile devices by, among other means, intercepting location data, usage patterns, digital fingerprints or unique identifiers (like cookies and device IDs), and other technical information (such as phone model, OS, browser type and version) that consumers unknowingly provide to mobile phone applications that have incorporated the Rubicon Tracker.

7. App developers often use SDKs because the kits minimize development work and create a predictable stream of income that grows as more people use the app.

8. App developers embed SDKs into their app, but may not know the full extent and functions of the code in the SDK. Some SDKs, unbeknownst to consumers, siphon consumers' location data directly to a data broker or advertising platform. They can even include the ability to track users' locations through public Bluetooth beacons, which enable fine-grained tracking indoors.

9. Data brokers such as Magnite provide SDKs to app developers to assist them in developing their apps. But in exchange for doing so, the app developers permit data brokers like Magnite to surreptitiously intercept location data and other user data they then use to profit at the expense of consumers.

10. Magnite does so by selling customized data feeds to its clients to, among other purposes, assist in advertising and analyzing foot traffic at stores or other locations. Among other categories, Magnite sells timestamped latitude and longitude coordinates showing the location of mobile devices.

11. Because the data is associated with particular device IDs, disaggregated data—such as location and other data that Magnite surreptitiously collects— is later repackaged and sold to third parties by Magnite, without consumers' consent, and is easily deanonymized.

12. For example, in 2018, The New York Times was able to use purportedly "anonymous" location data to track multiple people to abortion clinics, follow them inside, and unmask them. The article's authors reviewed a database of data collected by one app data collector, and determined that the data revealed locations that individuals visited to within a few yards.[1]

13. Likewise, The Pillar, a Catholic Substack publication, outed a homosexual priest using location data purchased from a data broker like Magnite. Although the data was not associated with names or particular addresses, investigators isolated location data from a dating app, Grindr, showing that the device frequently was found at the priest's residence. By cross-referencing that device ID with other locations known to be frequented by the priest, investigators were able to confirm the device ID was associated with the priest, and that his mobile device frequently visited gay bars and private residences associated with other Grindr users.[2]

[1] Jennifer Valentino-DeVries et al, Your Apps Know Where You Were Last Night, and They're Not Keeping it Secret, New York Times (Dec. 10, 2018), available at: https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html?mtrref=www.vice.com&gwh=3919FC4278D0708838A67ACD4CF87224&gwt=pay&ass (last viewed February 28, 2025)

[2] Joseph Cox, The Inevitable Weaponization of App Data is Here, Vice (July 21, 2021), available at: https://www.vice.com/en/article/grindr-location-data-priest-weaponization-app/ (last viewed February 28, 2025).



LOEVY & LOEVY
Attorneys at Law

14. As these examples show, user and device data, such as the kind that Magnite surreptitiously collects from consumers, can be used to identify specific individuals—even without information such as the person's name or address—and determine specific locations that the individual visited, all without informing or obtaining consent from the person tracked.

## PARTIES

15. Plaintiff Edward Lewis is, and at all times mentioned herein was, a natural person who resides in the city of Sacramento, California.

16. Plaintiff Gladys Solis is, and at all times mentioned herein was, a natural person who resides in the city of Victorville, California.

17. Plaintiff Patricia Castillo is, and at all times mentioned herein was, a natural person who resides in the city of Whittier, California.

18. Defendant is, and at all times mentioned herein was, a Delaware corporation with its principal place of business located at 12181 Bluff Creek Dr., 4th Floor, Los Angeles, California.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

20. This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Plaintiff Castillo resides in this

District. Defendant is also subject to jurisdiction under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally accessed the computer in California. Plaintiffs were in California when Defendant accessed their devices and installed its Rubicon Tracker. Magnite also has a substantial business presence in California. The Rubicon Tracker was developed in California by Magnite's corporate predecessor, The Rubicon Project, Inc., which was founded and headquartered in Los Angeles. Since The Rubicon Project, Inc. changed its name to Magnite in 2020 and moved its headquarters to New York, Magnite has maintained substantial business operations in its Los Angeles office, Magnite's second-largest, which employs more than 100 people.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

**STANDING**

22. Since America's founding, privacy has been a legally protected interest at the local, state and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271-72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded as 'providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law").

23. The invasion of privacy rights is a "concrete and particularized" injury sufficient to confer standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold

LOEVY & LOEVY
Attorneys at Law

to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized").

24. As set forth in detail below, Plaintiffs allege that they were personally injured when Defendant impermissibly obtained Plaintiffs' personal information, including data sufficient to enable Defendant to ascertain a user's location and track their website activity over time, and thus target that user with advertisements tailored to their location and/or browsing history. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g.*, *Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing").

25. Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value, and by alleging that Defendant profited from the misappropriated data.

26. Courts regularly find such allegations sufficient to confer standing on plaintiffs alleging violations of their privacy rights under CIPA. *See, e.g., Shah v. Fandom, Inc.* __ F. Supp. 3d __, 2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) (plaintiffs had standing based on allegations that "the collection of their IP addresses through the Trackers allows the third parties to obtain 'personally identifying, non-anonymized information,' and that the IP addresses reveal geographical location and other personal information sufficient for third parties to conduct targeted advertising"); *Mirmalek v. Los Angeles Times Comm'ns LLC*, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educational Sys. Inc.*, 742 F. Supp.

3d 1072, 1078 (C.D. Cal. 2024) (plaintiff had standing based on allegations that defendant collected plaintiff's information, thereby constituting an invasion of privacy which is an "actionable injur[y]").

## FACTUAL ALLEGATIONS

### I. The California Invasion of Privacy Act

27. The California Constitution recognizes the right to privacy inherent in all residents of the State. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

28. The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.*, (1994) 7 Cal.4th 1, 81, (Mosk, J., dissenting).

29. One means by which California protects its residents' constitutional right of privacy is CIPA. In enacting CIPA, the California legislature expressed its concern

that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Penal Code § 630.

30. To guard against such unwarranted privacy invasion, CIPA is very clear in its prohibition against unauthorized interception of a third party's communications without the consent of the other person: "Any person who, by means of any machine, instrument, or contrivance, or any other matter, intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, instrument of any internal telephonic communication system, or who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state [violates this section]." Penal Code § 631(a).

31. In addition to its prohibition of wiretapping, CIPA also proscribes any person from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." Penal Code § 638.51(a).

32. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Penal Code § 638.50(b).

33. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other

dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication. Penal Code § 638.50(b).

34. In plain English, a "pen register" is a "device or process" that records outgoing information, whereas a "trap and trace device" is a "device or process" that records incoming information. A "pen register" and "trap and trace device" are collectively referred to herein as "Pen-Traps."

35. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law.

36. For example, with the passage of the 2001 USA PATRIOT Act, the Pen-Trap definition was expanded to include a device or process to keep up with the advancement and evolution of Internet technologies and communications. In 2015, the California Legislature overwhelmingly adopted this updated and expanded definition without a single vote in opposition. See Stats. 2015, ch. 204, § 1 (A.B. 929) (eff. Jan. 1, 2016); *see also In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F. Supp. 3d 889, 898 n.46 (S.D. Tex. 2014) (citing Susan Freiwald, *Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of PR/TT technology from mechanical device to computer system)).

37. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address that the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if the same user receives an email, a "trap and trace device" might record the email address

it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

38. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v. Kochava*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466, at *15 (S.D. Cal. July 27, 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

39. Individuals may bring an action against the violator of any provision of CIPA—including sections 631(a) and 638.51 of the Penal Code—for $5,000 per violation. Penal Code § 637.2(a)(1).

## II. <u>Tracking Technologies and IP Addresses</u>

40. Trackers collect information about internet users as those users are browsing the web. Trackers use cookies, scripts or pixels inserted by publishers or advertisers. Tracker profiling is the process of linking data from different websites to build user profiles based on browsing history, to place users in groups, and to sell that data to third parties so that they can use it for targeted advertising.

41. A broad range of online technologies track and monitor internet-based interactions and communications. Four identifier tools commonly used are (i) website

LOEVY & LOEVY
Attorneys at Law

cookies, (ii) tracking pixels, (iii) digital fingerprinting, and (iv) software development kits.

42. A website cookie is a small text file that a website server creates and transmits to a web browser (e.g., Chrome or Safari) which then installs and stores the file in a particular directory on an individual's computer, phone or other device. When a website user attempts to access a webpage, the user's browser transmits a communication to the website's server requesting that the server display the website's content for the browser to load. While providing the requested content to the user, the website's server also provides the cookies that it would like the user's browser to install and retain.

43. Website cookies contain information that identifies the domain name of the webserver that wrote the cookie (e.g., hulu.com or facebook.com). Cookies also have information about the user's interaction with a website, such as how the website should be displayed; how many times a user has visited the website; how long a user spends on a webpage; information about what pages the user visited; and authentication information. In addition to a unique identifier and a site name, website cookies also can include personally identifiable information such as a user's name, address, email address and/or telephone number if that information was provided to a website.

44. A first-party cookie is implemented by the website that the user accesses. The website uses its cookies for authentication, monitoring user sessions, and collecting analytical data. A third-party cookie, also called an "advertising cookie" or a "tracker cookie," is a cookie that belongs to a domain other than the one being displayed to the user in his or her browser. A third-party cookie typically is used for cross-site tracking, retargeting and ad-serving. The key differences between the first- and third-party cookies are who sets them (i.e., a website display host or a third party),

whether and how they can be blocked by a web browser, and the cookies' availability. A third-party advertising or tracker cookie is accessible on any website that loads the third-party server's code.

45. A pixel, also known as a "tracking pixel," "web bug," "clear GIF" or "web beacon," is similar to a website cookie. It is a small, almost-invisible image (pixel) embedded in a website or an email to track a user's activities. That tracked data often includes the user's operating system, the kind of website or email used, the time when the website was accessed, the user's IP address, and whether there are cookies that previously have been set by the server hosting the pixel image.

46. Digital fingerprinting refers to device fingerprinting and browser fingerprinting. Most digital fingerprinting is performed via a third-party tracker, which can track an individual across multiple sites and form a profile of the user.

47. A software development kit (SDK) is a set of computer programs and similar tools that developers and engineers can leverage to build applications for specific platforms. The SDK often includes, among other tools, libraries, application programming interfaces, instructions, guides, directions and tutorials. SDKs also may have embedded code that allows them to intercept personal data and other information from application users surreptitiously, including geolocation data, usernames and communications derived from other SDK applications installed on a user's device, and a user's activities within an application after installation.

48. All the information and data captured and collected by third-party trackers, regardless of the tool used, is capable of being sold and used for marketing and advertising purposes.

49. One important piece of identifying information collected by third-party trackers is a website user's IP address. An IP address is a unique identifier for a device, which is written as four sets of numbers separated by periods (e.g.,

123.145.167.189). The first two sets of numbers reflect what network the device is on; the second two sets of numbers identify the specific device. The IP address enables a device to communicate with another device, such as a computer's web browser communicating with a website server.

50. An IP address is a unique numerical code associated with a specific internet-connected device on a computer network. A unique IP address identifies each of the devices accessing a certain network at any given time.

51. Significantly, an IP address contains geographical location information from which the state, city and zip code of a specific device can be determined. Given the information that it can and does reveal, an IP address is considered personally identifiable information and is subject to HIPAA protection.[3]

52. While IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible. If an individual is not actively sending data packets out, the IP address remains private and is not broadcast to the wider internet.

53. Knowing a website user's IP address, and therefore the user's geographic location, provides a level of specificity previously unfound in marketing. An IP address allows advertisers to target customers by countries, cities, neighborhoods and postal code. Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads that are relevant to their interests.[4]

54. Indeed, IP targeting is one of the most successful marketing techniques that companies can employ to spread the word about a product or service because

[3] *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

[4] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businessesherbert-williams-z7bhf/

companies can use an IP address to identify individuals personally.[5] By targeting specific households or businesses, a company can avoid wasting money on ads that are unlikely to be seen by their target audience and can reach their target audience with greater precision. Additionally, by analyzing data regarding which households or businesses are responding to their ads, IP address targeting can help businesses improve their overall marketing strategies and refine their marketing efforts.[6]

55. As alleged below, Defendant employed trackers on various third-party websites and apps, which were thereby installed on Plaintiffs' and Class Member users' browsers and computing devices. Those trackers unlawfully have collected browser and device data as well as identifying and addressing information about Plaintiffs and Class Members, including their IP addresses. They have done so without a court order and without Plaintiffs' or Class Members' consent.

## III. <u>Magnite's Collection of User Data</u>

56. Through its Privacy Policy and SEC filings, Magnite acknowledges that it collects vast amounts of data from users who visit websites and use mobile apps utilizing the Rubicon Tracker.

### A. *<u>Magnite's Privacy Policy</u>*

57. Magnite's Advertising Platform Privacy Policy clearly identifies its collection of web users' personal information. Magnite has varied its description of the types of data it collects, but during the time period within the statute of limitations

---

[5] Trey Titone, *The future of IP address as an advertising identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

[6] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businessesherbert-williams-z7bhf/



LOEVY & LOEVY
Attorneys at Law

– when the Rubicon Tracker was surreptitiously installed on each Plaintiff's devices – Magnite acknowledged that it collects:[7]

- **Usage Information:** including information about the domain, topic or name of the property, the date/time of visits, the search terms you enter, visitor activities and actions, viewability data, the video title, video player size, description or category being displayed, click data, types of advertisements viewed
- **Log Information:** including information about the type of browser you use, app version, access times, pages viewed, and the page you visited before navigating to the Digital Media Properties

- **Device Information**: including information about the computer or mobile device you use, including, device make, device model, device operating system, device operating system version, and data connection type;
- **Location Information:** We may derive the approximate location of your device from your IP address (geographic region or state). In accordance with your device permissions, we may also receive information about the precise location of your device but only if our clients pass it to us. Precise location may be deemed as sensitive personal information in some jurisdictions. Please see **Additional Information for California Residents** below to learn more about how we process sensitive personal information should it be passed to us;
- **Internet service information**: including information about which Internet Service Provider (ISP) you use;
- **Deidentified information**: We may process certain other deidentified data that enables us to serve you with advertisements, such as encrypted or hashed forms of your email address if our clients pass these to us. In cases where we may deidentify User Information, we commit to not re-identifying that information.
- **Derived information**: We may also receive information from third parties at the instruction or for the benefit of our clients that provide user demographics and information with respect to a user's preferences, patterns, click and video interactions, behaviors or interests, as well as advertisers and advertising platforms that provide information to us in order to match an ad opportunity offered by our clients with the right advertisement.
- Magnite and our clients may collect and store inferences about user activity using our Services.

58. Magnite's current Advertising Platform Privacy Policy is less specific, but still acknowledges the collection of a vast amount of user data, including "Device Characteristics," Browsing and Interaction Data," "User's Profiles, User behavior data, derived information," and "Precise Location Data," which Magnite candidly acknowledges "is 'sensitive personal information' under certain State Privacy Laws":[8]

[7] https://web.archive.org/web/20240214200047/http://magnite.com/legal/advertising-platform-privacy-policy/. This screenshot was obtained from the Magnite's Advertising Privacy Policy as of February 14, 2024, as captured by the Internet Archive's Wayback Machine.

[8] https://www.magnite.com/legal/advertising-platform-privacy-policy/ (last accessed February 22, 2025).



LOEVY & LOEVY
Attorneys at Law

| **Category & Types of User Information we collect** | **Categories of Recipients** *We may disclose personal information to...* | **Purposes** *We use personal information to...* |
|---|---|---|
| Device characteristics<br><br>Browsing and Interaction Data<br><br>Non-precise Location data<br><br>User's Profiles, User behavior data, derived information<br><br>Precise Location Data (which is "sensitive personal information" under certain State Privacy Laws) | • Our Clients;<br>• Magnite Affiliates;<br>• Our vendors and service providers;<br>• Our Partners;<br>• In connection with a business transfer;<br>• Law enforcement or others in legal proceeding;<br>• To protect the rights of Magnite or others. | • Select advertising using limited data;<br>• Create profiles for personalised advertising;<br>• Use profiles to select personalised advertising;<br>• Create profiles to personalise content;<br>• Measure advertising performance;<br>• Understand audiences through statistics or combinations of data from different sources<br>• Develop and improve services;<br>• Ensure security, prevent and detect fraud, and fix errors;<br>• Deliver and present advertising and content;<br>• Save and communicate privacy choices. |



LOEVY & LOEVY
Attorneys at Law

B. *Magnite's SEC Filings*

59. Magnite's SEC filings also emphasize its focus on big data collection and the implementation of such data in applicable AI models. For example, in its most recent 10-K for its fiscal year ending December 31, 2024, Magnite explained that "[a] core aspect of our value proposition is our big data and machine-learning platform that is able to discover unique insights from our massive data repositories containing proprietary information on trillions of bid requests and served advertisements."[9] In its 2023 10-K, Magnite was explicit in stating that its "massive data repositories" included items such as "user location, … how many ads the user has seen, browser or device information, and sellers' proprietary data about users."[10]

C. *How Magnite Collects Web Browsing Data*

60. When users enter a web page where the Rubicon Tracker is implemented, the tracker typically collects the exact clicks, including the location within the page, videos the user watched, ads they clicked, as well as "context" including the category and title of the page, referrer page, IP address, and derived geolocation data. It also attaches a cookie with a unique user ID that tracks the user across the web and multiple devices.

61. For example, the following screen shots show the information Magnite collects when a user visits a popular website such as healthline.com to seek information on dealing with an adult child with depression:

[9] https://www.sec.gov/ix?doc=/Archives/edgar/data/1595974/000159597425000008/mgni-20241231.htm, p. 8 (last accessed February 22, 2025)
[10] https://www.sec.gov/ix?doc=/Archives/edgar/data/1595974/000159597424000014/mgni-20231231.htm, p. 8 (last accessed February 22, 2025).



LOEVY & LOEVY
Attorneys at Law




62. Based on the user simply visiting this page, Magnite collects a packet of data which includes the user's persistent cookie, the specific URL visited, and a characterization of the content as "depression" and "mental health" to help advertisers target this user with specific ads. The following screenshots illustrate this packet capture demonstrating the persistent cookie passing with the URL and content characterization:

LOEVY & LOEVY
Attorneys at Law




LOEVY & LOEVY
Attorneys at Law

Response

Pretty Raw Hex Render

```
HTTP/2 200 OK
Server: nginx/1.21.4
Date: Tue, 11 Jun 2024 09:38:54 GMT
Content-Type: application/json
Cache-Control: no-cache, no-store, max-age=0, must-revalidate
Expires: Wed, 17 Sep 1975 21:32:10 GMT
Access-Control-Allow-Credentials: true
Access-Control-Allow-Origin: https://www.healthline.com
Pragma: no-cache
Vary: Accept-Encoding

{
  "status":"ok",
  "account_id":11314,
  "site_id":127964,
  "zone_id":604646,
  "size_id":15,
  "tracking":"",
  "inventory":{
    "ref":"https:\/\/www.healthline.com\/health\/depression\/how-to-help-an-adult-child-with-depression",
    "pos":"DMR3",
    "gpid":"\/4788\/hl\/pagenumber1\/DMR3_sticky3__slot",
    "url":"https:\/\/www.healthline.com\/health\/depression\/how-to-help-an-adult-child-with-depression",
    "page":"https:\/\/www.healthline.com\/health\/depression\/how-to-help-an-adult-child-with-depression",
    "pbadslot":"%2F4788%2Fhl%2Fpagenumber1%2FDMR3_sticky3__slot",
    "domain":"healthline.com",
    "k1":"depression",
    "k2":"mentalhealth"
  },
  "ads":[
    {
      "status":"ok",
      "impression_id":"2a3cc361-5629-4a1e-bb60-0e5351086f99",
      "size_id":"15",
      "ad_id":"3236009",
      "advertiser":2031272,
      "network":2307,
      "creative_id":"2307:51ehhu7m",
      "seat":2307,
```


63. The packet capture also includes additional information to assist the advertiser in targeting the user, such as IP-derived geolocation, city, state, zip code, longitude and latitude coordinates, OS, browser, and more, as illustrated by the following screen shot:



LOEVY & LOEVY
Attorneys at Law




64. In easier-to-read format, the data packet captured by Magnite – again, just from a user clicking on this healthline.com article – includes the following:

| | | |
|---|---|---|
| city | Los Angeles | City |
| ct | United States | Country |
| st | California | State |
| zip | 90060 | ZIP Code |
| dma | 803 | Designated Market Area (DMA) |
| env | web | Environment (web or in-app) |
| clkUrl | https://insight.adsr... | Click URL |
| site_url | www.healthline.com | Site URL |

| | | |
|---|---|---|
| rgz | 90060 | Region Code |
| svbttd | 1 | Server Boot Time |
| dt | PC | Device Type |
| osf | OSX | Operating System Family |
| os | Other | Operating System |
| br | Chrome | Browser |
| rlangs | en | Request Languages |
| mlang | | Measurement Language |
| svpid | 11314 | Server Provider ID |
| did | MGNI-AP-17233 | Device ID |
| rcxt | Other | Request Context |
| lat | 34.054400 | Latitude |
| lon | -118.244100 | Longitude |
| tmpc | 15.180000000000007 | Temperature in Celsius |
| daid | | Device Advertising ID |
| vp | 0 | Viewability Percentage |
| osi | | Operating System Info |
| osv | | Operating System Version |
| bffi | 41 | Browser Fingerprint ID |
| mk | Apple | Manufacturer |

65. Magnite also collects communications sent by a user to the website. Specifically, when users use the search engine of websites, Magnite collects the search query along with the persistent cookie. Magnite collects this information even when the search involves sensitive health information, such as a user entering the term "chemotherapy" on the popular Drugs.com pharmaceutical website:




66. Along with the other user-specific information described above, Magnite also captures the specific query, enabling its advertising clients to know that this specific user is searching for chemotherapy drugs:

LOEVY & LOEVY
Attorneys at Law




67. Magnite also intercepts user communications every time a user visits a website. When an individual visits a website, they communicate a wide variety of information to that website. This can be as simple as their selection of an article or video the individual would like to view, but can also include highly personal information such as health status and treatment, travel plans, political affiliation, sexual orientation, and many, many more.

68. When the Rubicon Tracker is loaded on to a website, Defendant surreptitiously intercepts these communications. The primary way this is accomplished is through the collection of the universal resource locator ("URL") for each page of each website visited by an individual.

69. Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

70. Each page on a website has its own individual URL, allowing pixels with access to the URL to see which pages of a website a particular Internet user visited.

71. All URLs identify the pages of each page of a website an internet user visited, but some—depending on the design of the website—also disclose the contents



LOEVY & LOEVY
Attorneys at Law

of information entered onto a webpage. These URLs are known as full-string descriptive URLs.

72. For example, when a user enters information into the Zillow website indicating the property they are interested in renting, touring, or purchasing, that information is included in the URL of the webpage and is collected by the Rubicon Tracker.

73. For example, a user who searches for homes for sale in Los Angeles and clicks on the property listed for sale at 5735 Bowesfield St. will be directed to a web page bearing the URL, "https://www.zillow.com/homedetails/5735-Bowesfield-St-Los-Angeles-CA-90016/20587970_zpid/."

74. As such, any pixel that intercepts the URL on this page also intercepts the content of the users' communications with Zillow about their real estate plans. This process works similarly on other websites.

75. The Rubicon Tracker collects the URL values of the pages visited by millions of internet users and, thus, intercept communications between the individuals and those websites, including sensitive information like travel information and health information.

76. The Rubicon Tracker collects both types of URLs and any information that can be gleaned or inferred from those URLs is added to the profiles that Defendant has for that particular user.

77. The Rubicon Tracker is configured to intercept confidential communications between internet users and websites. The intercepted information is then added to Defendant's consumer profiles and shared with bidders and advertisers as part of the real-time bidding process on thousands of websites.

78. By aggregating data such as the location of the search healthcare-related searches, personal interests, and financial well-being, combined with the persistent

cookie tracking, Magnite is able to build a complete user online fingerprint, which is meant to uniquely identify users across sessions and devices.

D. *How Magnite Collects User Mobile App Usage Data*

79. The Rubicon Tracker is also prevalent in mobile apps. When a user opens an app tracked by the Rubicon Tracker, the tracker collects similar data to the web tracker (as described above) with the addition of (i) precise geolocation data when available; (ii) mobile data usage analytics (i.e., app version, mobile OS usage); and (iii) unique device identifiers that enable cross-app tracking (and in corroboration with web and smart TV offerings, cross-platform tracking).

80. Magnite tracks specific content accessed by a user on a Rubicon-enabled app by applying a cookie and tracking the device type and device ID, as shown on the following screen shots from the NBA app:




81. The packet capture contains multiple points of data, including the specific content viewed:






LOEVY & LOEVY
Attorneys at Law

82. Magnite also collects precise geolocation data directly from mobile devices which, according to its Advertising Privacy Policy, may be disclosed to Magnite's clients (i.e., advertisers), its vendors and service providers, and law enforcement.

83. Magnite collects this data just from a user opening a mobile app, without taking any specific action such as clicks or searches. For example, as seen in the images below, when a user opens the CNN mobile app, the data collected by Magnite includes the mobile carrier, device model and OS version, IP address, device ID, advertising ID, and location information including geolocation data coordinates up to the 4th decimal, which correlates to an approximate 30-foot accuracy.




LOEVY & LOEVY
Attorneys at Law

84. Simply by virtue of the user having opened the app, Magnite collected information regarding the carrier, device ID, advertising ID, IP address and more – including precise geolocation data:




```
"https%3A%2F%2Fplay.google.com%2Fstore%2Fapps%2Fdetails%3Fid%3Dcom.cnn.mobi
le.android.phone",
"name":"CNN",
"content":{
}
},
"device":{
"w":412,
"h":892,
"dnt":0,
"ua":
"Mozilla/5.0 (Linux; Android 14; Build/URD9.230712.002.A1; wv) AppleWebKit/
537.36 (KHTML, like Gecko) Version/4.0 Chrome/124.0.6367.179 Mobile Safari/
537.36",
"language":"en",
"osv":"14",
"model":"Android 14.0",
"make":"Generic",
"ppi":242,
"pxratio":1,
"js":1,
"os":"Android",
"ip":"45.132.159.133",
"carrier":"Clouvider",
"ifa":"feecb9a4-09d9-44e3-90c1-ebddb128e2fa",
"geo":{
  "lat":34.0544,
  "lon":-118.2441,
  "country":"USA",
  "region":"CA",
  "city":"Los Angeles",
  "zip":"90060",
  "ipservice":3,
  "type":2
},
"lmt":0,
"ext":{
  "ifa_type":"aaid"
},
```


## IV. Magnite's Monetization of User Data

85. Magnite monetizes the wealth of information collected by the Rubicon Tracker in a wide variety of ways. Primarily, as described in its 10-K, Magnite "generates revenue from transactions where it provides a platform for the purchase and sale of digital advertising inventory."[11] Stated another way, Magnite's collection of data enables its ad seller clients to offer better targeting to ad buyers. In addition, as

[11] https://www.sec.gov/ix?doc=/Archives/edgar/data/1595974/000159597425000008/mgni-20241231.htm, p. 61 (last accessed February 28, 2025).

one of the internet's largest ad bidding companies, Magnite can leverage its hoard of data to provide value to both ad sellers and ad buyers through efficient and dynamic ad pricing.

86. Magnite sells its services through a variety of product offerings, all of which are dependent on Magnite's massive collection of user data enabling it to construct accurate digital fingerprints of web- and mobile app-using consumers, which are meant to uniquely and persistently identify users across sessions and devices.

87. Through Magnite Access, for example, Magnite offers identity solutions such as audience segmentation and data enrichment, as well as data matching services across various digital media platforms (web, mobile, audio, and smart TV).

88. Another offering is "Magnite Audiences," which Magnite describes as a "cross-publisher segment that Magnite packages to make it easier and more efficient for buyers to reach high-value audiences at scale" and "generates a potential new revenue stream for publishers."

89. Magnite also seeks to increase the value of its data collection through the use of AI. The more data Magnite accumulates, the more it can train its machine-learning algorithms to build ever more detailed profiles of web and mobile app users, leading to higher-quality matching between ad buyers and sellers and thus adding value to the services Magnite provides to its customers.

90. Magnite has also launched ClearLine, a "self-service solution that provides agencies direct access to buy premium video inventory on the company's platforms." Essentially, Clearline "can link ad exposures to actual purchases without going through a particular retailer's ad platform."

91. Magnite has also partnered with Attain, a company specializing in purchase data. Attain primarily sources its data through Klover, a financial services

LOEVY & LOEVY
Attorneys at Law

app that it owns, and Klover users link their retail loyalty programs to the finance app to secure pay advances. Attain organizes this data into a panel which can then be matched to Magnite's campaign and audience data. Through this partnership, Magnite leverages its extensive data and audience segmentation to track individuals' real-time purchasing behaviors, enabling advertisers to re-target consumers based on these insights.

92. To sell the services listed above, Magnite needs to collect data that identifies a particular user. This is why Magnite collects IP addresses: it allows Magnite to ascertain a user's identity and target that user with personalized advertisements, as well as to track user's website and app activity over time (i.e., through repeated website visits and app use) to target a user with advertisements relevant to the user's personal browsing activity.

93. In other words, when users visit websites or use apps on which Magnite's Rubicon Tracker is installed, Magnite through its Rubicon Tracker collects users' IP addresses so that it can analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant further monetize the data it has collected and maximize revenue.

94. Further, because Magnite's Rubicon Tracker is present on multiple websites, Magnite can track Plaintiff and Class Members across multiple websites using their IP addresses and other device identifier information, and can build a more complete profile of Plaintiff and Class Members for advertising purposes using this same information.

95. Magnite's Rubicon Tracker also combines the massive data it collects from consumer with data collected by pixels installed by advertisers with whom Magnite contracts that have their own pixels ("Partner Pixels") integrated into the

design of websites. To facilitate deanonymization of user data as well as the "real-time bidding process" Magnite offers its advertising buyers and sellers, the Partner Pixels interact with and receive information from the Rubicon Tracker when both the Partner pixel and Rubicon Tracker are loaded onto a particular website.

96. While the information collected by Magnite is alone enough to deanonymize users, its aggregation of its data with information collected through Partner Pixels leads to even greater identification of individual internet users with a vast network of companies eager to obtain deanonymized user data.

97. As Magnite itself boasts in its SEC filings, the practices detailed above "integrate[s user data] with a number of third party data, attribution and identity vendors, allowing buyers and sellers to leverage these solutions directly through [Magnite's] platform without the need for multiple vendor contracts."[12]

98. This integration not only facilitates advertisers' business processes, but also gives Magnite's customers more assurance that they are targeting the right user, allowing "for more accurate audience matching and ID resolution."[13] In other, Magnite's massive digital surveillance operation not only provides advertisers with a "one-stop shop," it also provides assurances that the target user's privacy is completely unmasked.

**V. <u>Magnite Obtains Consumers' Data Without Consent</u>**

99. As noted above, Magnite has a privacy policy which describes the information it collects through the Rubicon Tracker.

[12] https://www.sec.gov/Archives/edgar/data/1595974/000159597424000014/mgni-20231231.htm, p. 9 (last accessed October 3, 2025).
[13] https://www.magnite.com/blog/how-magnite-access-powers-smarter-omnichannel-advertising/ (last accessed October 3, 2025).



LOEVY & LOEVY
Attorneys at Law

100. Like the Rubicon Tracker itself, however, this policy is completely invisible to the users of the websites and mobile apps on which the Rubicon Tracker is installed.

101. Users, including Plaintiffs and Class Members, had no knowledge that while they were browsing websites or using mobile apps, that Magnite – a company completely unrelated to the purveyor of the website or mobile app – was tracking not only their browsing and app usage, but also their location as they used their phones or other devices.

102. Moreover, users (including Plaintiffs and Class Members) had no knowledge that Magnite was aggregating the trove of collected data to build a highly personalized, deanonymized digital fingerprint of users' movements, both physically and across the internet, and making that data available to countless unknown advertisers.

103. And certainly, users (including Plaintiffs and Class Members) did not consent to Magnite's collection, deanonymization, and distribution of their data.

104. By installing and using the Rubicon Tracker without Plaintiffs' and Class Members' prior consent and without court order, Defendant violated CIPA § 638.51(a). In doing so, Defendant both violated Plaintiffs' and Class Members' right to privacy and the control of their personal information, and enriched itself by collecting Plaintiff's and Class Member's personal information for marketing, advertising, and data analytics purposes.

## VI. <u>Facts Specific to Plaintiffs</u>

105. Plaintiff Gladys Solis regularly visits websites and uses mobile apps which utilize the Rubicon Tracker, specifically including but not limited to: nytimes.com, msn.com, people.com, yahoo.com, quora.com, accuweather.com, nbcnews.com, apnews.com, and theguardian.com.

106. Ms. Solis has used these apps and/or visited these websites consistently for several years, and has used or visited each of them within the past ten months while present in California.

107. Ms. Solis regularly uses a mobile device to access the websites and apps listed above. On information and belief, through her use of these websites and apps while in California, Magnite has tracked her geolocation, and monitored and intercepted communications related to her personal characteristics, mode of living, purchase decisions, app selections, spending habits, and click choices, amongst others.

108. By virtue of her use of the websites and apps listed above while in California, Ms. Solis has unknowingly provided data to Magnite, including her browsing history, search queries, IP address, and geolocation data. On information and belief, the data collected by Magnite has enabled it to build a profile of Ms. Solis that is so detailed that it is essentially deanonymized.

109. As described above, Magnite has shared, sold and/or and distributed Ms. Solis' personal and private information to third parties, including without limitation its customers, advertising partners, and website publishers.

110. Ms. Solis values her privacy, and she has never consented to Magnite's collection of her personal data. Indeed, until recently she did not know that her browsing habits, electronic communications, and physical movements were being collected, intercepted and tracked by Magnite, and she has never consented to Magnite doing so.

111. Plaintiff Patricia Castillo regularly visits websites and uses mobile apps which utilize the Rubicon Tracker, specifically including but not limited to: msn.com, foxnews.com, yahoo.com, espn.com, tmz.com, cnn.com, zillow.com, accuweather.com, realtor.com, and nbcnews.com.

112. Ms. Castillo has used these apps and/or visited these websites consistently for several years, and has used or visited each of them within the past ten months while in Caliifornia.

113. Ms. Castillo regularly uses a mobile device to access the websites and apps listed above. On information and belief, through her use of these websites and apps while in California, Magnite has tracked her geolocation, and monitored and intercepted communications related to her personal characteristics, mode of living, purchase decisions, app selections, spending habits, and click choices, amongst others.

114. By virtue of her use of the websites and apps listed above while in California, Ms. Castillo has unknowingly provided data to Magnite, including her browsing history, search queries, IP address, and geolocation data. On information and belief, the data collected by Magnite has enabled it to build a profile of Ms. Castillo that is so detailed that it is essentially deanonymized.

115. As described above, Magnite has shared, sold and/or and distributed Ms. Castillo's personal and private information to third parties, including without limitation its customers, advertising partners, and website publishers.

116. Ms. Castillo values her privacy, and she has never consented to Magnite's collection of her personal data. Indeed, until recently she did not know that her browsing habits, electronic communications, and physical movements were being collected, intercepted and tracked by Magnite, and she has never consented to Magnite doing so.

117. Plaintiff Edward Lewis regularly visits websites and uses mobile apps which utilize the Rubicon Tracker, specifically including but not limited to: yahoo.com and cnn.com.

118. Mr. Lewis has used these apps and/or visited these websites consistently for several years, and has used or visited each of them within the past ten months while in California.

119. Mr. Lewis regularly uses a mobile device to access the websites and apps listed above. On information and belief, through his use of these websites and apps while in California, Magnite has tracked his geolocation, and monitored and intercepted communications related to his personal characteristics, mode of living, purchase decisions, app selections, spending habits, and click choices, amongst others.

120. By virtue of his use of the websites and apps listed above while in California, Mr. Lewis has unknowingly provided data to Magnite, including his browsing history, search queries, IP address, and geolocation data. On information and belief, the data collected by Magnite has enabled it to build a profile of Mr. Lewis that is so detailed that it is essentially deanonymized.

121. As described above, Magnite has shared, sold and/or and distributed Mr. Lewis' personal and private information to third parties, including without limitation its customers, advertising partners, and website publishers.

122. Mr. Lewis values his privacy, and he has never consented to Magnite's collection of his personal data. Indeed, until recently he did not know that his browsing habits, electronic communications, and physical movements were being collected, intercepted and tracked by Magnite, and he has never consented to Magnite doing so.

**VII. <u>Class Allegations</u>**

123. **Class Definition:** Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action on behalf of the following class (the "Class"):

> All persons in the United States whose personal information, communications, or private information, or data derived from their

LOEVY & LOEVY
Attorneys at Law

> personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

124. **California Subclass:** Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action on behalf of the following subclass (the "California Subclass"):

> All California residents in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

125. The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

126. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; anyone employed by counsel in this action, any judge to whom this case is assigned, his or her spouse and immediate family members, and members of the judge's staff.

127. *Numerosity*. Members of the Classes are so numerous that joinder of all Class Members is impractical. Given the ubiquitous use of the Rubicon Tracker on a wide variety of popular websites and mobile apps, the number of persons in the Classes is estimated to be in the millions. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

128. *Commonality and predominance*. A well-defined community of interest exists in the questions of law and fact involved in this case. Questions of law and fact common to the Class Members that predominate over questions affecting only individual Class Members include without limitation:

LOEVY & LOEVY
Attorneys at Law

a. Whether Plaintiffs and Class Members had a reasonable expectation of privacy when they accessed and visited websites and apps on which the Rubicon Tracker had been installed during the class period;

b. Whether Defendant knowingly and without permission accessed Plaintiffs' and Class Members' computers and mobile devices during the proposed class period;

c. Whether Defendant knowingly and without permission took, copied or made use of any data from Plaintiffs' and Class members' computers and mobile devices during the class period;

d. Whether Plaintiffs and Class members had a reasonable expectation of privacy in their personally identifying information, including IP addresses, device data, and geolocation data, when they accessed and visited websites and apps on which the Rubicon Tracker had been installed during the class period;

e. Whether Magnite's use of the Rubicon Tracker to collect Plaintiffs' and Class Members' personal information and communications constitutes wiretapping as defined by Cal. Penal Code § 631(a);

f. Whether Magnite's use of the Rubicon Tracker to collect Plaintiffs' and Class Members' personal information and communications constitutes the unauthorized use of a pen register or trap and trace device as defined by Cal. Penal Code § 638.51;

g. Whether Plaintiffs and Class Members consented to Defendant's collection of their personal information and communications;

h. Whether Defendant's utilization of the Rubicon Tracker is necessary to operate, maintain, and test a wire or electronic communication service;

i. Whether Defendant's acts and practices violated the California Constitution or individual rights arising under the California Constitution;

j. Whether Defendant's acts and practices resulted in unjust enrichment to Defendant;

k. Whether Plaintiffs and Class Members are entitled to damages resulting from Defendant's conduct.

129. *Typicality*. Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all Class Members, have suffered from the same violations of the law as other putative Class Members. Plaintiffs' claims and the Class Members' claims



LOEVY & LOEVY
Attorneys at Law

are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to Plaintiffs and all of the other Class Members.

130. *Adequacy*. Plaintiffs will adequately safeguard the interests of the Class Members, as Plaintiffs' interests align with, and do not contradict, those of the Classes. Plaintiffs' counsel has experience in handling class action litigation, including in the area of consumer digital privacy.

131. *Superiority*. A class action is the most effective, efficient and fair way to resolve this dispute, as individual litigation by all Class Members is impractical and would overburden the court system. It would also risk inconsistent judgments and increase delays and expenses for all involved parties. In contrast, proceeding as a class action presents few management challenges, conserves resources, and protects the rights of each Class Member. Plaintiffs expect no difficulties in managing this case as a class action.

## CAUSES OF ACTION

### First Cause of Action: Intrusion Upon Seclusion

132. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

133. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

134. Plaintiffs bring this claim pursuant to California law.

135. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." Hernandez v. Hillsides, Inc. 47 Cal. 4th 272, 286-87 (2009).

LOEVY & LOEVY
Attorneys at Law

136. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

137. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

138. Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

139. Plaintiffs and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

140. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a) Defendant engages in widespread data collection and interception of Plaintiffs' and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

(b) Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the Magnite products described herein.

(c) Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

(d) Defendant sells or discloses these profiles, which contain the improperly collected data about Plaintiffs and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiffs' and Class Members'

common law right to privacy and the control of their personal information.

141. Defendant's amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

142. In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

143. Accordingly, Plaintiffs and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**Second Cause of Action: Violation of the California Invasion of Privacy Act California Penal Code § 631**

144. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

145. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

146. The Rubicon Tracker, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

147. Within the applicable statute of limitations, each Plaintiff and Class Member used the search function of and/or interacted with a website or mobile app on which the Rubicon Tracker was installed to communicate search terms or preferences to the applicable website or mobile app operator, with the expectation of receiving search results or other information provided by that operator.

148. Within the applicable statute of limitations, Magnite, via the Rubicon Tracker, without the consent of Plaintiffs and Class Members, and in an unauthorized manner, willfully read or attempted to read or learn the contents or meaning of Plaintiffs' and Class Members' electronic communications contemporaneous with the communications' transit through or passing over any wire, line or cable with the communications sending from or being received at any place within California.

149. The information collected by Magnite was not for the sole benefit of the party to whom the communication was sent.

150. Plaintiffs and Class Members did not authorize or consent to the tracking, interception, and collection of any of Plaintiffs' electronic communications.

151. This violation of section 631(a) of the California Penal Code constitutes an invasion of Plaintiffs' and Class Members' privacy.

152. Pursuant to section 637.2 of the California Penal Code, Plaintiffs and Class Members have been injured by Defendant's violation of section 631(a), and seek statutory damages of $5,000 for each of Defendant's violations of section 631(a).

153. By knowingly violating a criminal statute without Plaintiff's and Class Members' prior consent, Defendant acted intentionally with oppression and malice. As such Defendant is liable for punitive damages pursuant to Cal. Civil Code § 3294.

**Third Cause of Action: Violation of California Invasion of Privacy Act**
**California Penal Code § 638.51**

154. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

155. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

156. Section 638.1 of the Penal Code provides that it is illegal for any "person" to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53."

157. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

158. The Rubicon Tracker is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—specifically including, without limitation, the IP address, location data, device information, and browsing history—from the electronic communications transmitted by each Plaintiff's and Class Members' computer or phone.

159. An IP address is "routing" or "signaling" information because it is sending or directing the users' communications from their device to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches [them] correctly." The Rubicon Tracker also collects users' device fingerprint information, including browser type and device type, that allows for further identification of users. Accordingly, the Rubicon Tracker is a "pen register."

160. At all relevant times, Defendant knowingly installed the Rubicon Tracker—which is a pen register—on each Plaintiff's and Class Member's browser or device, and used the Rubicon Tracker to collect and track each Plaintiff's and Class Member's IP address and other personal information as detailed herein, for the purpose of monetizing the aggregation of data as to each Plaintiff and Class Member by the means described herein.

161. Unaware of Defendant's installation and use of the third-party trackers as pen registers during the proposed class period, Plaintiffs and Class Members could not

LOEVY & LOEVY
Attorneys at Law

have provided and did not provide consent to Defendant's installation of the Rubicon Tracker on their devices, nor did they consent to Magnite's collection, aggregation, and monetization of their personal data.

162. Magnite did not obtain a court order to install or use the Rubicon Tracker to collect Plaintiffs' and Class Members' personal data.

163. Pursuant to section 637.2 of the California Penal Code, Plaintiffs and Class Members have been injured by Defendant's violation of section 638.51(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 638.51(a).

164. By knowingly violating a criminal statute and accessing each Plaintiff's and Class Member's browsers and devices to install tracking software without each Plaintiff's and Class Member's prior consent, Defendant acted with oppression and malice. As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

**Fourth Cause of Action: Invasion of Privacy**

**Violation of Art. I, § 1, California Constitution**

165. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

166. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

167. "Privacy" is listed in Article I, Section 1, of the California Constitution as one of six fundamental rights of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1. 146. The right to privacy in California's Constitution

creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope and actual or potential impact as to constitute an egregious breach of social norms.

168. Plaintiffs and Class members had a legally protected privacy interest in their personally identifying information and addressing information that was captured during the proposed class period, without notice or consent, when they accessed and viewed website and apps on which the Rubicon Tracker was installed. Those privacy interests are recognized by the California Constitution, CIPA, HIPAA, and numerous other statutes.

169. Plaintiffs and Class Members had a reasonable expectation of privacy under the circumstances, as they could not reasonably have expected that Defendant would violate state and federal privacy laws. During the proposed class period, Plaintiffs and Class Members were not aware and could not reasonably have expected that Defendant would use website tracking technology and install trackers and cookies without notice and without obtaining consent. Those unauthorized trackers collected and transmitted to Defendant Plaintiffs' and Class Members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

170. Defendant's unauthorized (1) installation of tracking technologies and (2) unauthorized collection of Plaintiffs' and Class Members' personally identifying and addressing information during the proposed class period, all without consent or adequate notification to Plaintiffs and Class Members, were invasions of Plaintiffs' and Class Members' privacy.

LOEVY & LOEVY
Attorneys at Law

171. Defendant's conduct during the proposed class period constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information surreptitiously collected by Defendant was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to collect and use that personally identifying, addressing, and geolocation information; and (iii) the invasion deprived Plaintiffs and Class Members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

172. As a direct and proximate result of Defendant's actions, Plaintiffs and Class Members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

173. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned or received by Defendant as a result of or in connection with the intrusions upon Plaintiffs' and Class Members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiffs and Class members properly for the harm to their privacy interests.

174. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Fifth Cause of Action: Unjust Enrichment**

175. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

176. Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

177. In both cases, Plaintiffs bring this claim pursuant to California law.

178. Defendant received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense.

179. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of valuable personal information and data that Defendant collected from Plaintiffs and Class Members without authorization and proper compensation. Defendant has collected, disclosed, and otherwise misused that information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation from third parties that received Plaintiffs' and Class Members' personal information and data.

180. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

181. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in California for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and practices alleged in this Complaint.

182. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**Sixth Cause of Action: Violation of the Electronic Communications Privacy Act 18 U.S.C. § 2511(1), *et seq.***

183. Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

LOEVY & LOEVY
Attorneys at Law

184. Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

185. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

186. The ECPA protects both the sending and the receipt of communications.

187. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

188. The transmission of Plaintiffs' website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

189. The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

190. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

191. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

192. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

193. The following instruments constitute "devices" within the meaning of the ECPA:

(a) The Rubicon Tracker, and any other tracking code or SDK used by Defendant;

(b) Plaintiffs' and Class Members' browsers;

(c) Plaintiffs' and Class Members' mobile devices;

(d) Defendant and each website's web and ad servers;

(e) Each Partner Pixel;

(f) The plan Defendant carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

194. Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

195. By utilizing the Rubicon Tracker, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members in violation of 18 U.S.C. § 2511(1)(a).

196. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class Members regarding virtually every aspect of their lives, including their health, private interests, buying habits, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

197. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

198. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

199. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

200. Defendant was not acting under the color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

201. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiffs and Class Members had a reasonable expectation that

Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

202. The foregoing acts and omission therefore constitute violations of 18 U.S.C. § 2511(1), *et seq*.

203. As a result of each and every violation thereof, on behalf of themselves and the Classes, Plaintiffs seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members, respectfully seek from the Court the following relief:

a. An order certifying the Classes, appointing Plaintiffs Edward Lewis, Gladys Solis, and Patricia Castillo as representatives of the Class, and appointing counsel for Plaintiffs as Class Counsel;

b. An order enjoining Defendant from engaging in the acts and practices complained of in this Complaint;

c. An order declaring that Defendant's actions, as described above, violated California Penal Code § 631;

d. An order declaring that Defendant's actions, as described above, violated California Penal Code § 638.51;

e. An order declaring that Defendant's actions, as described above, violated Art. 1, § 1 of the California Constitution;

f. For each violation of CIPA, a judgment for and award of statutory damages of $5,000 under California Penal Code § 637.2 to Plaintiffs and each Class Member;

g. A judgment for and award of restitution, disgorgement of profits, and nominal damages to which Plaintiffs and all of the members of the Class are entitled by law;

h. Payment of costs of the suit;

i. Payment of attorneys' fees under California Code of Civil Procedure § 1021.5;

j. An award of pre-judgment and post-judgment interest to the extent allowed by law; and

k. Such other and/or further relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Dated: October 7, 2025

Respectfully submitted,

/s/ Thomas M. Hanson
*One of Plaintiffs' Attorneys*

Thomas M. Hanson, Bar No. 184465 (hanson@loevy.com)
David B. Owens, Bar No. 275030 (david@loevy.com)
Jon Loevy (jon@loevy.com) (*pro hac vice*)
Mike Kanovitz (mike@loevy.com) (*pro hac vice*)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)

*Attorneys for Plaintiffs and Interim Class Counsel*

LOEVY & LOEVY
Attorneys at Law

**CERTIFICATE OF SERVICE**

I, Thomas M. Hanson, an attorney, hereby certify that on October 7, 2025, the foregoing document was filed using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Thomas M. Hanson
*One of Plaintiffs' Attorneys*