REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Nicola C. Menaldo, *pro hac vice*
NMenaldo@perkinscoie.com
Anna Mouw Thompson, *pro hac vice*
AnnaThompson@perkinscoie.com
Jordan C. Harris, *pro hac vice*
JordanHarris@perkinscoie.com
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: 206.359.8000
Facsimile: 206.359.9000

Alisha C. Burgin, Bar No. 286269
ABurgin@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for Defendant Magnite, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

EDWARD LEWIS and PATRICIA CASTILLO, individually and on behalf of similarly situated individuals,

Plaintiffs,

v.

MAGNITE, INC.,

Defendant.

Case No. 2:25-cv-03448-MWC-SSC

**MAGNITE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date: June 12, 2026
Time: 1:30 p.m.
Courtroom: 6A
Judge: Hon. Michelle Williams Court

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 9
II. STATEMENT OF FACTS .......... 11
  A. Magnite's khaos ID .......... 11
  B. Real-time bidding process and Magnite's role in the process .......... 11
  C. Online advertising segments .......... 13
  D. How Magnite honors consumer privacy choices .......... 14
  E. Plaintiff's evidence in support of class certification .......... 15
  F. Magnite's investigation into Plaintiff's khaos IDs .......... 16
III. LEGAL STANDARD .......... 16
IV. ARGUMENT .......... 17
  A. Plaintiff's proposed class definitions are incomprehensible. .......... 17
  B. Plaintiff does not satisfy the typicality requirement under Rule 23(a)(3). .......... 17
    1. Plaintiff is not a class member and has not suffered the same injury as the class members. .......... 18
    2. Plaintiff is subject to unique defenses. .......... 18
  C. Plaintiff's proposed common questions do not generate common answers satisfying Rule 23(a)(2). .......... 21
    1. Whether the khaos cookie was "set" in a browser varies from class member to class member. .......... 22
    2. Whether Magnite collected, shared, or profited from "private" information varies from class member to class member. .......... 23

D. Rule 23(b)(3) is not satisfied because individualized issues predominate across Plaintiff's claims. ....... 24

1. The same issues infecting Plaintiff's proposed common questions defeat predominance. ....... 25

2. Many class members impliedly or expressly consented to the challenged conduct through myriad means. ....... 25

3. Many class members lack Article III standing. ....... 27

4. Many class members' claim(s) are time barred. ....... 29

5. The terms of class members' agreements with Magnite's customers present additional individualized issues. ....... 30

6. Plaintiff fails to propose a classwide damages methodology. ....... 30

7. Plaintiff's nationwide classes should not be certified because state-by-state differences in law predominate. ....... 32

E. A class action is not "superior" under Rule 23(b)(3). ....... 33

V. CONCLUSION ....... 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ahmad v. Old Republic Nat'l Title Ins. Co.*,
690 F.3d 698 (5th Cir. 2012)....................23

*Al-Ahmed v. Twitter, Inc.*,
648 F. Supp. 3d 1140 (N.D. Cal. 2023)....................29

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................25

*Averza v. Super Micro Comput., Inc.*,
788 F. Supp. 3d 1060 (N.D. Cal. 2025)....................19

*Backhaut v. Apple Inc.*,
2015 WL 4776427 (N.D. Cal. Aug. 13, 2015)....................9

*Betts v. Reliable Collection Agency, Ltd.*,
659 F.2d 1000 (9th Cir. 1981)....................17

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017)....................33

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020)....................29

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021)....................29

*Brown v. Google*,
2022 WL 17961497 (N.D. Cal. Dec. 12, 2022)....................9, 25, 26

*Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*,
2019 WL 1170489 (N.D. Cal. Mar. 13, 2019)....................31

*Calhoun v. Google*,
349 F.R.D. 588 (N.D. Cal. 2025)....................25

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016)....................31

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 27

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .......... passim

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) .......... 33

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) .......... 9, 18, 23, 28

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .......... 18, 19

*Hart v. TWC Prod. & Tech. LLC*,
2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) .......... 19, 25

*Hernandez v. WM Wholesale, LLC*,
2025 WL 2551105 (C.D. Cal. Mar. 28, 2025) .......... 30

*In re Google RTB Consumer Privacy Litigation*,
2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) .......... 9, 23, 25, 26

*In re Kia Hyundai Vehicle Theft Litig.*,
2024 WL 2104571 (C.D. Cal. Apr. 22, 2024) .......... 29

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 27

*Joiner v. NHL Enters., Inc.*,
2025 WL 2846431 (S.D.N.Y. Aug. 29, 2025) .......... 32

*Kandel v. Brother Int'l Corp.*,
264 F.R.D. 630 (C.D. Cal. 2010) .......... 19

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 19, 32

*Kingsbury v. U.S. Greenfiber, LLC*,
2009 WL 10655254 (C.D. Cal. Mar. 30, 2009) .......... 17

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 26, 27

*Leon v. Loandepot.com, LLC*,
2025 WL 2632396 (C.D. Cal. Aug. 22, 2025) .......... 28

*Lindblom v. Santander Consumer USA, Inc.*,
2018 WL 573356 (E.D. Cal. Jan. 26, 2018) .......... 30

*Lineberry v. AddShoppers, Inc.*,
2025 WL 1533136 (N.D. Cal. May 29, 2025) .......... 18, 19, 20

*Low v. LinkedIn Corp.*,
2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) .......... 28

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .......... 16, 32, 33

*McDonald v. Kiloo ApS*,
385 F. Supp. 3d 1022 (N.D. Cal. 2019) .......... 33

*Mickelonis v. Aspyr Media, Inc.*,
2025 WL 1605332 (C.D. Cal. May 16, 2025) .......... 33

*Midpeninsula Citizens for Fair Hous. v. ACCO Mgmt. Co.*,
168 F.R.D. 647 (N.D. Cal. 1996) .......... 17

*O'Connor v. Uber Techs., Inc.*,
904 F.3d 1087 (9th Cir. 2018) .......... 30

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 16, 24

*Opperman v. Path, Inc.*,
2016 WL 3844326 (N.D. Cal. July 15, 2016) .......... 32, 33

*Perry-Hudson v. Twilio, Inc.*,
2024 WL 4933332 (N.D. Cal. Dec. 2, 2024) .......... 30

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. Aug. 26, 2025) .......... 28

*Rodriguez v. Google LLC*,
2024 WL 38302 (N.D. Cal. Jan. 3, 2024) .......... 33

*Rojas v. HSBC Card Servs. Inc.*,
93 Cal. App. 5th 860 (2023) .......... 25

*Ruegsegger v. Caliber Home Loans, Inc.*,
2019 WL 8163640 (C.D. Cal. Jan. 8, 2019) .......... 24

*Rusow v. Skinspirit Essential LLC*,
2026 WL 453476 (N.D. Cal. Feb. 18, 2026) .......... 30

*Saedi v. SPD Swiss Precision Diagnostics GmbH*,
2025 WL 1141168 (C.D. Cal. Feb. 27, 2025) .......... 30

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 19

*Standard Fire Ins. Co. v. Knowles*,
568 U.S. 588 (2013) .......... 31

*Stitt v. Citibank*,
2015 WL 9177662 (N.D. Cal. Dec. 17, 2015) .......... 32

*Thomasson v. GC Servs. Ltd. P'ship*,
539 F. App'x 809 (9th Cir. 2013) .......... 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 27

*True Health Chiro., Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) .......... 25

*Valiente v. Simpson Imports, Ltd.*,
717 F. Supp. 3d 888 (N.D. Cal. 2024) .......... 29

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 17, 21

**Statutes**

Cal. Civ. Code § 3515 .......... 28

Cal. Penal Code § 637.2 .......... 19, 31

**Rules**

Fed. R. Civ. P. 23(a)(2) .......... 21

Fed. R. Civ. P. 23(a)(3) .......... 17

Fed. R. Civ. P. 23(b)(3) ....................................................................................33

**Other Authorities**

1 *McLaughlin on Class Actions* § 5:60 (22nd ed. Nov. 2025 update) ......................19

# I. INTRODUCTION

Plaintiff asks this Court to certify sweeping nationwide classes encompassing countless millions of individuals whose interactions with Magnite's technology vary in virtually every respect. Plaintiff glosses over these differences with generalities about how online advertising works. But class certification requires more than generalizations—it requires Plaintiff to "affirmatively demonstrate" through "evidentiary proof" that common questions predominate over individual ones. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). On the actual record in this case, Plaintiff cannot do so.

Courts in this Circuit have repeatedly denied class certification in cases involving the same type of online advertising technology at issue here—and on facts far more favorable to certification than the facts of this case. In *Griffith v. TikTok, Inc.*, 2024 WL 4308813 (C.D. Cal. Sept. 9, 2024), the court denied certification where an internet-wide tracking pixel collected varying types of information from different websites, defeating both commonality and predominance. *Id.* at *5–6. In *In re Google RTB Consumer Privacy Litigation*, 2024 WL 2242690 (N.D. Cal. Apr. 4, 2024), the court denied certification of damages claims due to individualized consent issues stemming from variation in class members' "understanding of Google's, RTB participants', and third parties' disclosures." *Id.* at *14. In *Brown v. Google*, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022), the court likewise found that individualized consent questions predominated. *Id.* at *19. So, too, in *Backhaut v. Apple Inc.*, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015), *aff'd*, 723 F. App'x 405 (9th Cir. 2018), where the court denied certification due to "panoply of sources" giving rise to individualized consent issues. *Id.* at *14–16. The same problems—and more—are present here.

Even if Plaintiff were an appropriate class representative (which he is not for several profound reasons, including because he lacks evidence that Magnite ever

received information about him), the classes he proposes should not be certified. The core problem with Plaintiff's motion for class certification ("Motion") is that it treats Magnite's technology as though it operates identically for every person who visits any website on the internet. It does not. Whether Magnite's cookie is even set in a class member's browser depends on that person's browser, device, and settings—and many popular browsers block third-party cookies like Magnite's by default. Even when Magnite's cookie is set, whether Magnite received, used, or shared any "private" information about a given class member depends on what websites that person visited, what information the website's publisher (or their intermediary) chose to pass to Magnite, and whether the class member opted out. Further, whether a given class member consented to Magnite's practices—expressly or impliedly—depends on an individualized inquiry into that person's agreements with publishers, exposure to privacy policies, interaction with cookie banners, and general awareness of how online advertising works. Courts have recognized that each of these inquiries defeats class treatment.

Additional individualized issues compound the predominance problem. The proposed classes include no temporal limitation and make no effort to exclude the many class members whose claims are time-barred—even though the applicable statutes of limitations are just one and two years, and Magnite's khaos cookie has been in use since 2020. California's intrusion upon seclusion tort is too bespoke to permit certification of a nationwide class. And Plaintiff offers no damages methodology capable of classwide measurement, instead asking the Court to defer that question "for later." Mot. 15. *Comcast* forbids that approach. 569 U.S. at 35.

Because this case presents exactly the kind of individualized issues that have led courts in this Circuit to deny class certification in analogous online tracking cases—and several additional barriers to class certification that those cases did not involve—the Court should deny the Motion.

## II. STATEMENT OF FACTS

### A. Magnite's khaos ID

This lawsuit challenges Magnite's purportedly "secret use" of the "khaos ID." Mot. 1.[1] The khaos ID is an alphanumeric string pseudonymously ascribed to a given device and browser combination—such that the same person will have different khaos IDs assigned to the browser on their phone versus on their desktop computer, and a single khaos ID will be associated with a computer browser used by multiple different people. Wieland Decl. ¶ 7. Subject to significant variations discussed throughout this brief, Magnite's platform will attempt to set a "khaos cookie" in a device's browser the first time it opens a website that uses Magnite's platform (directly or through an intermediary technology) to fill ad space. *Id.* ¶¶ 8–9. Once set, the khaos cookie assigns and stores a khaos ID. *Id.* ¶ 10. The khaos cookie, and khaos ID contained within it, remain in the device's browser until it expires, which will happen if the user fails to visit a publisher that uses Magnite's platform once every 365 days, or if the user "clears cookies." If the khaos cookie expires or is deleted, Magnite's platform will try to set a new khaos cookie the next time the browser opens a website that uses Magnite's platform. *Id.* ¶ 11; Thompson Decl. Ex. 1 (hereinafter "Schnell Report") ¶¶ 8, 36.

The khaos cookie does not send information to Magnite; it only assigns and stores a khaos ID in the user's browser. Once assigned, the khaos ID can be sent to Magnite through the Real-Time Bidding ("RTB") process. Wieland Decl. ¶ 12.

### B. Real-time bidding process and Magnite's role in the process

Most websites and mobile applications ("apps") earn revenue through digital advertising, typically by selling advertising space through RTB auctions. Wieland Decl. ¶ 6, 14. In the ad tech industry, those websites and apps are referred to as "publishers." *See* Schnell Report ¶ 22; Wieland Decl. ¶ 6. Generally speaking, the

[1] Plaintiff uses "khaos ID" and "Rubicon Tracker" interchangeably. Mot. 3 n.10.

RTB process works as follows:

An ad request is generated. When a visitor opens a webpage or an app, the applicable advertising integration or workflow generates an "ad request" to attempt to sell advertising space. Wieland Decl. ¶ 17. The fields that *might* be included in a given ad request are standard and largely governed by the OpenRTB Protocol, which was established by the Interactive Advertising Bureau ("IAB") industry group in 2010 so various technologies in the RTB ecosystem could "talk" to one another. Wieland Decl. ¶¶ 18–19.

Most of those fields are optional, however—the publisher (or its third-party intermediary) decides whether and how to populate them. Wieland Decl. ¶ 19. This includes whether to include certain pseudonymous identifiers, such as Magnite's khaos ID. *Id.*; Schnell Report ¶¶ 27–28, 30. The publisher or its intermediary also decides whether to include with ad requests: the URL of the relevant webpage in full or truncated form (e.g., www.nyt.com/XXXX with or without the details after the slash); keywords describing the website (and, if so, what those keywords should be); a visitor's full or truncated IP addresses; a visitor's location information (and, if so, its level of precision); and so forth. Wieland Decl. ¶ 19.

Supply Side Platforms (SSPs) use the ad requests to create bid requests. Magnite is a supply side platform ("SSP"). SSPs primarily represent sellers in the RTB process—i.e., publishers like CNN or the New York Times looking to earn revenue from their advertising space, typically through intermediaries who specialize in monetizing digital properties. Wieland Decl. ¶ 14. The SSP processes the information in an ad request, adds information to and/or removes information from that ad request, and creates a "bid request." *Id.* ¶ 20. The SSP then sends the bid request to one or more Demand Side Platforms (DSPs), which represent buyers in the RTB process—i.e., advertisers. *Id.*

When Magnite receives an ad request, *if* both the seller and consumer preferences allow it, Magnite will check the "match table" that it maintains for a

given khaos ID to see if it has been associated with any DSP IDs. *See Id.* ¶ 21. Magnite uses match tables to associate IDs that are maintained by various players in the ad tech space—for instance, while Magnite refers to a given device and browser combination as "khaos ID 123," a DSP might refer to that same combination as "ABC." *Id.* Magnite replaces the khaos ID from an incoming ad request with an associated DSP ID in the outgoing bid request, if one exists. *Id.*

<u>The DSPs respond with bid responses</u>. Next, the DSP(s) decide whether and how much to bid on a given advertising space based on information that is included in the bid request and on additional information that the DSP has in its own system or receives from its own clients. *Id*. ¶ 23. The DSPs send their "bid responses" back to Magnite, which then selects a "winning" bid response to remit, which will compete against the bids of other interested parties. *Id*. ¶ 23. The publisher (or its third-party intermediary) might select the Magnite-provided bid response, or a different bid response provided by a different source, and works with its chosen advertising integration or workflow to place an ad accordingly. *Id.*

This whole process happens in milliseconds. *Id*.

**C. Online advertising segments**

Magnite also stores advertising segments. A segment is a collection of pseudonymous IDs believed to share a common theme or trait—such as website visitors believed to be interested in basketball or to be between the ages of 18–34. *Id*. ¶ 22. Magnite obtains segments from publishers, advertisers, and other third-party data providers, which are defined by reference to third-party IDs. *Id.* Magnite also creates segments based on information it receives directly from scripts that publishers install on their websites, which are defined by reference to khaos IDs. *Id.* In preparing bid requests, Magnite checks if a khaos ID or third-party ID appears in any segments; if so, Magnite may include a unique "deal" identifier in the bid request, representing a segment known to be relevant to the DSP or advertiser. *Id.*

**D. How Magnite honors consumer privacy choices**

Magnite contractually obligates its customers to use its technologies consistent with applicable laws, including the California Consumer Privacy Act ("CCPA"), generally accepted privacy self-regulatory guidelines, including the principles of the Digital Advertising Alliance ("DAA") and the code of the Network Advertising Initiative ("NAI"), and other Magnite-specified requirements. For example, Magnite customers selling advertising space must:

- "not pass any data to Magnite that requires end user consent if it has not appropriately obtained such consent";
- "have and adhere to a current privacy policy," which must "accurately disclose all applicable data collection, use, and disclosure practices";
- "comply with all applicable Privacy Requirements and provide end users subject to such laws with a conspicuous link to a functional opt-out page (and with regard to the State Privacy Laws, the ability to opt out of 'sales,' 'sharing,' and 'targeted advertising' specifically");
- "ensure that any applicable end-user choices to opt out, limit ad tracking, or other similar settings or preferences are passed to Magnite" when sending ad requests to Magnite; and
- "not pass Magnite any information that permanently identifies a particular device."

*Id.* ¶ 24. In addition, DSPs and advertisers must "honor any end user or Seller provided choices to opt out, limit ad tracking, do not sell, or other similar settings or preferences indicated in [Magnite's] bid request." *Id.* ¶ 25. Finally, Magnite **prohibits** DSPs and advertisers from combining "any pseudonymous personal data received via the Magnite Platforms with any directly identifiable personal data (e.g., name, email) without the end user's consent." *Id.*

When Magnite receives an ad request, Magnite checks if the user has set any relevant permissions or has exercised opt-out rights and adjusts its practices

accordingly. *Id.* ¶ 26. It first checks the ad request itself for an opt-out signal—such as one set via the Global Privacy Control ("GPC") or a CCPA-mandated "do not sell" or "Your Privacy Choices" link on a publisher's website. In this case, Magnite will not associate any information from the ad request with a khaos ID (or any other pseudonymous identifiers in its system), and Magnite will exclude certain information in its outgoing bid request—such as the underlying IP address and any third-party IDs or segment information. *Id.* ¶ 26. Magnite also checks to see whether the khaos ID has a global opt-out flag, which Magnite sets if it receives an opt-out request via Magnite's own user choice portal or through automated tools such as those provided by the DAA and NAI. *Id.* ¶ 27. In these cases, Magnite strips the user's khaos ID from *all* incoming ad requests going forward, deletes information previously associated with the khaos ID from its systems, and makes the same aforementioned exclusions from outgoing bid requests. As of May 5, 2026, Magnite has received and honored at least 4.8 million opt-out requests. *Id.*

Separately, Magnite maintains a publicly available Advertising Platform Privacy Policy, which explains its data practices and links to the user choice portal and resources about how consumers can use other available opt-out mechanisms (e.g., the GPC signal). *Id.* ¶ 28; *see also* Thompson Decl. Exs. 87–88.

**E. Plaintiff's evidence in support of class certification**

Most of the evidence cited in Plaintiff's Motion is highly generalized, publicly available materials describing Magnite's overarching business (e.g., SEC filings) and data collection practices (e.g., Magnite's Advertising Platform Privacy Policy). *See* Mot. 2–3; Dkt. Nos. 80-02 to 80-06. Otherwise, Plaintiff cites: (1) Magnite's discovery responses, Dkt. No. 80-07, (2) Plaintiff's testimony that he visited "numerous" websites that purportedly use the khaos ID "including yahoo.com, cnn.com, zillow.com, nbcnews.com, foxnews.com, espn.com, and realtor.com," Mot. 4; Dkt. Nos. 80-09, 80-14, (3) a third-party declaration attaching screenshots with the results of a "search[] for cookies" on the browser on Plaintiff's

device, Dkt. Nos. 80-10 to 80-13, and (4) a list of 58 websites purportedly "identified as having Magnite's 'khaos ID' cookie installed" as obtained from a website called "SimilarWeb." Dkt. No. 80-01 ¶ 9 (describing Dkt. No. 80-08).

### F. Magnite's investigation into Plaintiff's khaos IDs

Magnite does not have any record of the only khaos ID that Plaintiff identifies as associated with his browser and device. *See* Dkt. 80-10, 80-13. Magnite's review of Exhibit 3 to the Mercado declaration and its own records suggests that Magnite's platform attempted to set a khaos cookie and assign the MOD4S8VQ-S-C59G khaos ID on April 24, 2026, well after the complaint was filed in this action, but was unable to do so. Wieland Decl. ¶ 29. Magnite was able to locate records of a different khaos ID (LY4V0YQQ-P-DCSH), which was first assigned sometime on or before July 2, 2024. *Id.* ¶ 30. Magnite has no record of it being associated with any segments. *Id*. It is currently associated with three third-party IDs in Magnite's user ID match table. *Id.*

## III. LEGAL STANDARD

To certify a class, Plaintiff must "affirmatively demonstrate" that the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) are met. *Comcast*, 569 U.S. at 33 (citation omitted). Plaintiff "must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022).[2] The Court "must conduct a 'rigorous analysis'" of those prerequisites. *Mazza v. Am. Honda Motor Co*., 666

---

[2] Plaintiff complains about the sufficiency of Magnite's discovery responses. *See* Mot. 3 n.9. But Plaintiff did not serve *any* discovery on Magnite until March 13, 2026, over a year after filing this lawsuit. Magnite's responses weren't due until just before Plaintiff's deadline to move for class certification, and Plaintiff has not even requested a meet-and-confer to discuss a path forward in light of Magnite's valid objections. Thompson Decl. ¶ 59. In short, Plaintiff's inability to marshal evidence in support of his Motion is a problem of his own making.

F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean*, 31 F.4th 651.

## IV. ARGUMENT

### A. Plaintiff's proposed class definitions are incomprehensible.

"Rule 23 requires that a class be defined." *Kingsbury v. U.S. Greenfiber, LLC*, 2009 WL 10655254, at *3 (C.D. Cal. Mar. 30, 2009). Plaintiff's proposed classes fail this basic requirement because they do not coherently "describe who is a member and who is not a member." *Midpeninsula Citizens for Fair Hous. v. ACCO Mgmt. Co.*, 168 F.R.D. 647, 648 (N.D. Cal. 1996). The classes extend to:

> All persons in the United States [or, for the subclass, in California] whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

Mot. 4–5. These definitions arguably reach *anyone for whom any data was used by anyone for any purpose*—due to the sentence structure (e.g., putting "through Defendant's platform" in the middle of the definitions), use of the passive voice (e.g., it doesn't need to be Magnite who "distributed" or "sold"), and use of overbroad catchalls (e.g., "data derived from" and "or otherwise"). This cannot be what Plaintiff means. Rather than guess at what he does mean, the Court should deny the Motion for failing to propose coherent class definitions. *See Midpeninsula*, 168 F.R.D. at 649 (rejecting "amorphously defined" and "overbroad" definition).

### B. Plaintiff does not satisfy the typicality requirement under Rule 23(a)(3).

Plaintiff may only serve as a class representative if his claims are typical of the classes' claims. Fed. R. Civ. P. 23(a)(3). This includes proving that the Plaintiff is "a member of the class[es] he represents," *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981), that he "possess[es] the same interest and suffer[s] the same injury as the class members," *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 348–49 (2011), and that he is not "subject to unique defenses which threaten to become the focus of the litigation," *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Plaintiff fails these requirements.

**1. Plaintiff is not a class member and has not suffered the same injury as the class members.**

Like the named Plaintiff deemed atypical in *Griffith*, Plaintiff has not "provide[d] evidence, that [Magnite] ever obtained any particularly sensitive information about [him], or any of [his] PII (such as name, phone number, or email address), through [his] online activity on websites that used the [khaos ID]." 2024 WL 4308813, at *8. The only khaos ID that Plaintiff identified as associated with him was apparently never actually set in his browser, and the other khaos ID identified by Magnite is not associated with any segments—so, there is no evidence that this khaos ID was ever connected to a common theme or trait (like "basketball fan") within Magnite's platform. *See supra* Part II.F.

Plaintiff has thus failed to prove by a preponderance of the evidence that Magnite "create[d] a profile" about him, or that Magnite "made available for sale or use," "distributed," or "sold" his "personal information," "communications," or "private information." Mot. 4. He is not a member of his own classes, which alone justifies denying Plaintiff's Motion. *See, e.g.*, *Lineberry v. AddShoppers, Inc.*, 2025 WL 1533136, at *7 (N.D. Cal. May 29, 2025) (Plaintiff failed to show that he was a "member of the class" because he failed to show that defendant collected his "detailed browsing activity"). For the same reason, Plaintiff has failed to show that he suffered the same type of injury as the putative class members. Even if others' "every step on the internet [was] followed and catalogued," Mot. 4, there is no indication this ever happened to Plaintiff.

**2. Plaintiff is subject to unique defenses.**

Plaintiff is also "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. First, Plaintiff's "evidentiary

record" is weak when "compared to the typical class member." *Lineberry*, 2025 WL 1533136, at *8 (rejecting a representative who deleted browsing history on her phone). The class would be better served by a representative armed with evidence.[3]

Second, Plaintiff consented to the challenged conduct, barring his claims. *See, e.g.*, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955–56 (N.D. Cal. 2017) (consent barred privacy claims); Cal. Penal Code § 637.2 (only allowing a person "injured by a violation" of CIPA to "bring an action"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945–46 (N.D. Cal. 2023) (dismissing unjust enrichment claim where defendant "did not collect information from Plaintiffs in a manner contrary to expectations created by the consent process").[4]

Plaintiff repeatedly consented to Magnite's receipt and use of his information via his agreements with Yahoo, which provides him with email services. SAC ¶ 117; Thompson Decl. Ex. 2, 56:4-57:25; 59:10-60:14; 63:1-64:4. Specifically, he agreed to Yahoo's Terms of Service and Privacy Policy by "using the Services," "hav[ing] an existing Yahoo account," and, presumably,[5] through the account

---

[3] Relatedly, the Court could also find Plaintiff or his counsel to be inadequate based on their "penchant for ignoring the standard rules of discovery," *Averza v. Super Micro Comput., Inc.*, 788 F. Supp. 3d 1060, 1083 (N.D. Cal. 2025), and failure "to comply with reasonable disclosure obligations or discovery requests," *Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010). Magnite served discovery over three months ago seeking (among other things) the pseudonymous identifiers that Magnite requires to search for information associated with Plaintiff. Thompson Decl. Exs. 56–57, ¶ 67. Plaintiff has not produced *any* such identifiers in discovery, notwithstanding repeated meet-and-confers on the issue. *Id.* ¶¶ 67–68.

[4] "The majority view is that unjust enrichment claims usually are not amenable to class treatment [at all] because the claim requires evaluation of the individual circumstances of each claimant to determine whether a benefit was conferred on defendant and whether the circumstances surrounding each transaction would make it inequitable for the Defendant to fail to return the benefit to each claimant." 1 *McLaughlin on Class Actions* § 5:60 (22nd ed. Nov. 2025 update); *see also Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *12 (N.D. Cal. Mar. 30, 2023).

[5] Under the current user flow, by creating an account, users "agree to [Yahoo's] Terms and Privacy Policy." Thompson Decl. Ex. 4. Plaintiff has baselessly objected

creation process. *Id*. Exs. 4, 5, 8. Yahoo's Privacy Policy links to a Cookies and Similar Technologies page that clearly discloses that Yahoo "allow[s] certain Third Parties to set or access their cookies and similar technologies on your device." *Id.* Ex. 8, 10. The linked "Third Parties" page specifically discusses third-party "Advertising technologies" like Magnite's, explaining that Yahoo "allow[s] certain companies **to serve advertisements and collect information within our Services**," including "**third party** ad servers, ad agencies, **technology vendors**, providers of sponsored content, research firms, **and other companies that help us provide more effective advertising.**" Thompson Decl. Ex. 13; *see also id.* Ex. 10 (attaching additional pages on Yahoo's use of cookies). Plaintiff also agreed to CNN.com's Terms of Use and "the collection and use of [his] information by cookies and similar technologies, as set forth in [CNN's hyperlinked] Privacy Policy" per the cookie banner on CNN.com, which Plaintiff regularly visits. *Id.* Exs. 15–16; *id.* Ex. 2, 56:4-8.[6] Plaintiff thus consented to the third-party khaos cookie being set on his device, and to the consequential receipt of information by Magnite, through at least his agreements with Yahoo and CNN. That consent, in turn, risks a ruling against Plaintiff on a ground that would not apply to the rest of the class, *Lineberry*, 2025 WL 1533136, at *6.

Third, both the Yahoo and CNN Terms of Use require Plaintiff to arbitrate claims related to his use of those services on an individual basis; provide for the

---

to producing evidence about his agreements with Yahoo. *See id.* Exs. 58–62 (objecting to Interrogatory No. 4 and Request for Production No. 8). As such, Plaintiff has not produced any evidence to suggest that his experience upon account creation was different from that of current users. And even if Plaintiff had produced such evidence, that would only prove the point: that Plaintiff is subject to unique defenses that threaten to become the focus of this litigation.

[6] Yahoo and CNN disclosed the relevant practices throughout the relevant time period. *See* Thompson Decl. Exs. 3, 6, 7, 9, 17, 18, 20. But even if Plaintiff contends that these or other website disclosures varied in material ways since March 2023, that would only add to the myriad individualized issues predominating over common ones in this case. *See infra* Part IV.D.

application of New York law; and include New York forum selection clauses. Thompson Decl. Exs. 5, 16. Plaintiff is thus potentially subject to additional contractual barriers to his claims.[7]

Fourth—even assuming *arguendo* that Magnite previously had or disclosed information about Plaintiff that is not reflected in its records, and notwithstanding that hypotheticals do not help Plaintiff given his burden of proof—Plaintiff's particular online practices sharply limit the quality and quantity of information that Magnite could have collected about him. Plaintiff uses the Safari browser on his phone, Thompson Decl. Ex. 2, 112:12–16, and the Microsoft Edge browser on his desktop, *id.*, 113:4–12 both of which block the khaos cookie by default. Wieland Decl. ¶¶ 8, 31–32; Schnell Report ¶¶ 10, 49, 51–52. The seven websites he browses that allegedly use the khaos ID concern benign topics like "news" and "real estate," Plaintiff never entered search terms on these websites, and—with the exception of his email provider, Yahoo—he never provided any real-world contact information to these websites. Thompson Decl. Ex. 2, 56:4–8, 63:10–23, 69:17–20, 72:21–73:14, 74:4–16, 84:7–85:4. For all these reasons, the information that Magnite might hypothetically have received about Plaintiff is uniquely limited and non-sensitive, as compared to his class allegations.

**C. Plaintiff's proposed common questions do not generate common answers satisfying Rule 23(a)(2).**

To satisfy Rule 23(a)(2), it is not enough to raise common questions "even in droves." *Wal-Mart*, 564 U.S. at 349–50. Rather, Plaintiff must prove that there are common questions whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. None of the questions proposed by Plaintiff satisfy this standard.

---

[7] Magnite expressly reserves the right to compel arbitration when Plaintiff produces documents sufficient to prove the timing and precise contours of his agreements with Yahoo and CNN. *See supra* note 5; *infra* Part IV.D.5 (discussing potential bases for Magnite to enforce provisions in third-party agreements).

### 1. Whether the khaos cookie was "set" in a browser varies from class member to class member.

Plaintiff's first two proposed common questions ask (1) whether "Magnite installed the Rubicon Tracker on the class members' computers when they visited websites that used it," and (2) whether khaos ID "constitutes a pen register or trap and trace device[.]" Mot. 6.[8] According to Plaintiff, "[e]ither the Magnite 'khaos ID' cookie is installed on the devices of users who visit Magnite's partner websites and mobile apps or it is not." Mot. 9.

But many people in the defined classes who have visited Magnite partner websites have never had a khaos cookie set in their browser. Schnell Report ¶¶ 64–65; Wieland Decl. ¶ 8. For example, many browsers—including Safari and Firefox—block third-party cookies like the khaos cookie by default. Schnell Report ¶¶ 18, fn.14, 49, 51–52. These are popular browsers used by hundreds of millions of users each month. Thompson Decl. Exs. 21–23; *see also* Schnell Report ¶ 70 (estimating that [redacted]). Consumers commonly update their settings to block cookies in other browsers, too.[9] These variables help explain why [redacted]. Schnell Report ¶ 64. Moreover, websites can configure the khaos cookie to load on only a subset of their webpages, meaning that even as to a single website, the khaos cookie may be set on some visitors' browsers and not others depending on the pages visited. Schnell Report ¶ 29.

Accordingly, the first question must be answered on a person-to-person basis; it doesn't satisfy the commonality requirement. *See Thomasson v. GC Servs.*

---

[8] The complaint alleges only a pen register, not a trap and trace, theory. SAC ¶ 158.

[9] *See* Colleen McClain et al., *How Americans Protect Their Online Data*, Pew Rsch. Ctr. (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-protect-their-online-data/ (reporting that 67% of survey respondents indicated that they had turned off cookies or website tracking while 44% said they used a browser or search engine that does not track them).

*Ltd. P'ship*, 539 F. App'x 809, 810–11 (9th Cir. 2013) (reversing with instructions to de-certify the class because call recording claims required "an individualized inquiry into each telephone call"). And the answer to the second question—whether "the [khaos ID] constitutes a pen register or trap and trace device"—does not matter until a factfinder determines that the khaos cookie was actually set in a given class member's browser. Put differently, because the legal nature of the Rubicon Tracker "presupposes the resolution of a question that cannot be answered on a class-wide basis with class-wide proof," it is not a common question that can be certified. *Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 705 (5th Cir. 2012).

**2. Whether Magnite collected, shared, or profited from "private" information varies from class member to class member.**

Plaintiff's third proposed question is whether "Magnite collected, shared, and profited from Class members' private information[.]" Mot. 6. But those issues are highly contextual as recognized by analogous online "tracking" cases. *See, e.g.*, *Griffith*, 2024 WL 4308813, at *1, *5–6 (commonality requirement unmet as to question of whether TikTok pixel was "installed on hundreds of thousands of websites"); *Google RTB*, 2024 WL 2242690, at *8–10 (no common, classwide answer to question of whether RTB data was "personally identifying," even though six named plaintiffs showed that *their* RTB data was identifying).

As to whether information is "private," here as in *Griffith*, "the variation in information gathered by different websites and as to different class members . . . defeats commonality." 2024 WL 4308813, at *8. What information Magnite actually receives about a given app or website visit, and thus whether arguably "private information" is collected, depends on a multitude of factors, including:

- The nature of the website or app—e.g., TMZ.com versus Drugs.com.
- Whether, how, and when each publisher (or their intermediary) chose to populate RTB protocol fields—e.g., whether to transmit URLs, geolocation, or descriptive keywords, and whether to send them in full or

truncated form.[10]

- What someone does on the website or app—e.g., whether they search for recipes or cancer information on healthline.com.
- How often a consumer uses a website or app.[11]
- Whether cookies are blocked from collection or use due to default or user-set browser settings or other user action, in which case Magnite does not receive and/or use its khaos ID. *See supra* Part II.D.

Separately, even if information is "private," whether Magnite "shares" or "profits from" such information also varies from class member to class member, due to the various ways that individual consumers can choose to prevent Magnite from receiving or sharing pseudonymous identifiers that would enable targeted advertising. *See supra* Part II.D. The Court need go no further in the analysis given Plaintiff's failure to satisfy Rule 23(a). The Motion should be denied.

**D. Rule 23(b)(3) is not satisfied because individualized issues predominate across Plaintiff's claims.**

Even if Rule 23(a) were satisfied, Plaintiff fails to "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33. Plaintiff invokes Rule 23(b)(3), Mot. 5, which "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean*, 31 F.4th at 664 (citation omitted). But given the nature of Plaintiff's claims and the sweeping class definitions that he has proposed, "individual issues would overwhelm issues common to a class," making a class action "impracticable." *Ruegsegger v. Caliber Home Loans, Inc.*, 2019 WL 8163640, at *16 (C.D. Cal. Jan. 8, 2019).

---

[10] For example, [redacted]. *See* Schnell Decl. ¶¶ 64, 66, 68–69.

[11] *See, e.g.*, Thompson Decl. Ex. 2, 71:3-5; 71:18-19; 72:7-8 (Plaintiff only visits certain websites "maybe once a month" or "maybe every other month").

**1. The same issues infecting Plaintiff's proposed common questions defeat predominance.**

Even if the Court concludes that at least one of Plaintiff's proposed questions satisfies the commonality requirement, the same issues making commonality a close call defeat predominance—a standard that is "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997).

**2. Many class members impliedly or expressly consented to the challenged conduct through myriad means.**

Consent is a defense to the claims in this action, and courts regularly deny class certification in cases involving the kinds of technologies at issue here because consent issues "must be litigated on an individual basis," *True Health Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018); *see, e.g.*, *Google RTB*, 2024 WL 2242690, at *14 (denying certification of damages claims due to individualized consent issues resulting from variation in class members' "understanding of Google's, RTB participants', and third parties' disclosures"); *Calhoun v. Google*, 349 F.R.D. 588, 597–98 (N.D. Cal. 2025) (similar); *Brown*, 2022 WL 17961497, at *19 (same); *Hart*, 2023 WL 3568078, at *10–11 (same). "[C]onsent can be 'express,' but it can also be 'implied in fact based on whether the surrounding circumstances demonstrate' that the party whose personal information was collected knew it." *Google RTB*, 2024 WL 2242690, at *12; *see also Rojas v. HSBC Card Servs. Inc.*, 93 Cal. App. 5th 860, 883, 885–87 (2023) (collecting CIPA cases applying implied consent). Here, individualized consent issues will overwhelm any single common question.

**<u>Magnite's Disclosures</u>.** Magnite discloses its practices in its Advertising Platform Privacy Policy and elsewhere on its website—including in the "User Choice Portal" that advises consumers about how to opt out of certain data use and sharing. Thompson Decl. Ex. 85–88; Wieland Decl. ¶¶ 28, 33. Plaintiff declares that there is "no evidence that any class member visited Magnite's website and saw

the privacy policy." Mot. 10. But Magnite's records show 218,154 visits to the Advertising Platform Privacy Policy from June 14, 2023, through March 5, 2025, and 14,182 visits to the User Choice Portal during the same period. Wieland Decl. ¶ 28. This alone provides ample evidence of individualized issues as to consent, since anyone who visited these pages but chose not to use Magnite's opt-out mechanisms described there would have impliedly consented to Magnite's conduct. *See, e.g.*, *Brown*, 2022 WL 17961497, at *19 (individualized consent issues would predominate based on evidence of visits to the defendant's "Learn More" page).

**Third-party Disclosures and Agreements.** Magnite's default Buyer and Seller terms contractually obligate Magnite customers to "have and adhere to a current privacy policy," which must satisfy certain requirements regarding functional opt-out pages and which must "accurately disclose all applicable data collection, use, and disclosure practices." Wieland Decl. ¶ 24. The publicly available policies of *every single one* of the 17 websites mentioned in the complaint disclose their use of third-party tracking. *See* Thompson Decl. Exs. 3 (summarizing), 8, 19, 24–38 (collecting and highlighting policies). Several of these websites—i.e., nytimes.com, msn.com, yahoo.com, and accuweather.com—also specifically mention Magnite or "Rubicon" (*see supra* n.1) by name in cookie policy or provider lists, *see* Thompson Decl. Exs. 3 (summarizing), 14, 64, 66, 67, 69, though such specificity is not necessary for consent to be valid, *Lakes v. Ubisoft*, Inc., 777 F. Supp. 3d 1047, 1057 (N.D. Cal. 2025). These third-party disclosures further demonstrate that individualized implied consent issues will predominate over Plaintiff's claims. *See, e.g.*, *Google RTB*, 2024 WL 2242690, at *14 (denying class certification based in part on publisher disclosures).

Many publishers also require express agreement in response to such disclosures. For example, the New York Times, which had 12.21 million paid, digital-only subscribers as of December 31, 2025, Thompson Decl. Ex. 63, discloses in its privacy policy that it uses "ad tracking technologies set by us or the

third party (e.g., cookies)," and provides in that policy a link to "a list of some of [these] service providers and third parties," which, in turn, references "Rubicon" (*see supra* n.1) and links to Magnite's privacy policy and user choice portal. Thompson Decl. Exs. 33, 64. The New York Times requires accountholders and subscribers to expressly agree to that Privacy Policy through a user flow that both "provides reasonably conspicuous notice of the terms to which the consumer will be bound," and requires "some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154–55 (9th Cir. 2025) (recognizing validity of similar "sign-in wrap" agreements); *see* Thompson Decl. Exs. 33, 49, 64, 79 (attaching "log in or create an account" page, terms of use, and privacy policy and related disclosures). All 17 of the websites discussed in the complaint take a similar approach for those who create an account or subscribe to certain features. *See id.* Exs. 3, 4, 39–54. Given the ubiquity of online subscriptions and other agreements, a significant portion of the class would have *expressly* consented to the conduct alleged by forming agreements with Magnite's customers.

Cookie banners, likewise, can give rise to either express or implied consent. *Lakes*, 777 F. Supp. 3d at 1054. Here again, at least 2 of the 17 websites discussed in the complaint use cookie banners or similar pop-ups. *See* Thompson Decl. Exs. 15, 55 (attaching screenshots from accuweather.com and cnn.com, which require a click to "accept" or "agree" to practices described in hyperlinked Privacy Policies).

Finally, many consumers are generally aware that their data is used for online advertising, which can give rise to implied consent. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 266 (3d Cir. 2016) ("Most [consumers] understand that what we do on the Internet is not completely private.").

**3. Many class members lack Article III standing.**

"Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)

(citations omitted). Where a proposed class includes a significant number of class members who suffered no injury, individualized questions regarding who was actually harmed predominate over common questions. *See Griffith*, 2024 WL 4308813, at *10 (denying class certification where it was "possible that the vast majority of class members have suffered no cognizable harm" from internet-wide tracking pixel). That is precisely the situation here.

Plaintiff's sweeping class definitions apply if any "data derived from" "personal information, communications, or private information" was "made available for . . . use." Mot. 4. But making data available does not always give rise to cognizable privacy or economic harm. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. Aug. 26, 2025) (plaintiff "identifie[d] no embarrassing, invasive, or otherwise private information collected by [the challenged technology]"); *Low v. LinkedIn Corp.*, 2011 WL 5509848, at *4 (N.D. Cal. Nov. 11, 2011) (plaintiff's allegations regarding "market value" of "browsing history" were "too abstract and hypothetical"). The class necessarily includes millions of individuals whose interactions with Magnite involved nothing remotely sensitive—such as a person who visited ESPN.com once and had nothing more than a generic, truncated URL included in an ad request, or a person whose browser blocked the khaos cookie entirely such that Magnite never associated any information with their browsing at all. *See supra* Parts II.B, IV.C.1. Determining which class members actually suffered cognizable harm requires multiple individualized inquiries.

Additionally, "a person who consents to an act is not wronged by it." Cal. Civ. Code § 3515. That many class members consented, *see supra* Part IV.D.2, compounds the individualized inquiries on harm that predominate over common questions here, *see, e.g.*, *Leon v. Loandepot.com, LLC*, 2025 WL 2632396, at *3 (C.D. Cal. Aug. 22, 2025) (rejecting putative class that "include[d] individuals who gave Defendant consent to contact them" and therefore lacked standing).

**4. Many class members' claim(s) are time barred.**

Plaintiff's proposed classes include no temporal limitation and make no attempt to exclude time-barred claims. This gives rise to statutes of limitations issues that "weigh[] strongly against predominance." *In re Kia Hyundai Vehicle Theft Litig.*, 2024 WL 2104571, at *7 (C.D. Cal. Apr. 22, 2024); *see also Valiente v. Simpson Imports, Ltd.*, 717 F. Supp. 3d 888, 907–08 (N.D. Cal. 2024) (striking class allegations because the "proposed class definition is untethered to any applicable statute of limitations").

Plaintiff's pen register claim is subject to a one-year statute of limitations, and his privacy and unjust enrichment claims are subject to a two-year statute of limitations. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 134 (N.D. Cal. 2020); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1069 (N.D. Cal. 2021); *Al-Ahmed v. Twitter, Inc.*, 648 F. Supp. 3d 1140, 1155 n.1 (N.D. Cal. 2023). Therefore, to pursue their pen register claims, each class member must, at a minimum, show that a khaos cookie was set in their browser sometime after March 5, 2024. *See* Mot. 9. But Magnite has offered the khaos cookie since its founding in 2020, Wieland Decl. ¶ 13, and many class members will have first visited websites using Magnite's platform well before March 5, 2024, such that the cookie currently in their browser was set more than a year ago. *See supra* Part II.A.

Similarly, to pursue their privacy and unjust enrichment claims, each class member must at least show that—after March 5, 2023—Magnite collected "private" information, Mot. 11, and/or used such information "to match bid requests between ad sellers and ad buyers[.]" Mot. 13. But to the extent this occurred, it happened to many class members before March 5, 2023, and not after that—e.g., due to submitting an opt-out request on or after March 5, 2023. *See supra* Part IV.D.2.[12]

---

[12] Plaintiff may argue for tolling, but that only exacerbates the predominance issues as it would require individualized inquiry into when someone "discovers or reasonably could have discovered the facts giving rise to her claim." *Lindblom v.*

**5. The terms of class members' agreements with Magnite's customers present additional individualized issues.**

Class members' agreements with Magnite's customers (*see supra* Part IV.D.2) may also require them to arbitrate their claims, bring them in other forums, or bring them under other states' laws. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094–95 (9th Cir. 2018) (reversing certification where some drivers' agreements required arbitration and included class action waivers). Indeed, of the 17 websites mentioned in the complaint, 12 have arbitration terms, and all 17 have forum selection clauses and/or choice-of-law terms. Thompson Decl. Ex. 3.

As multiple courts have recognized in this context, equitable estoppel permits Magnite to enforce the arbitration terms between consumers and Magnite's customers.[13] *See, e.g.*, *Perry-Hudson v. Twilio, Inc.*, 2024 WL 4933332, at *2–3 (N.D. Cal. Dec. 2, 2024) (compelling arbitration because the claims and purportedly "interdependent and concerted misconduct" between the website and Twilio were both "intimately founded in and intertwined with the underlying [website terms]"); Order Granting Motion to Dismiss, *Woods v. Verve Grp. Europe GMBH*, No. 5:24-cv-04909-NW (N.D. Cal. Dec. 9, 2025), ECF No. 54 (similar).

**6. Plaintiff fails to propose a classwide damages methodology.**

To certify a class under Rule 23(b)(3), Plaintiff must show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34.

---

*Santander Consumer USA, Inc.*, 2018 WL 573356, at *4 (E.D. Cal. Jan. 26, 2018); *Rusow v. Skinspirit Essential LLC*, 2026 WL 453476, at *1 (N.D. Cal. Feb. 18, 2026) (targeted ads put plaintiff on inquiry notice); *Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 1141168, at *10 (C.D. Cal. Feb. 27, 2025) (same).

[13] Even without relying on equitable estoppel, Magnite could invoke many arbitration agreements between publishers and consumers as a third-party beneficiary. *See, e.g.*, *Hernandez v. WM Wholesale, LLC*, 2025 WL 2551105, at *4 (C.D. Cal. Mar. 28, 2025) (defendant wholesaler was deemed an "affiliate" of online retailer selling its products and thus could enforce the forum selection clause in the retailer's online terms as a third-party beneficiary); Thompson Decl. Exs. 16, 71 (similar language in cnn.com and APNews.com terms).

Specifically, Plaintiff must propose a methodology to identify the amount that is "the result of the wrong" and "measure[s] only those damages attributable to that theory." *Id.* at 35–37 (cleaned up). Plaintiff fails to do so.

As to the CIPA claim, Plaintiff's simple "multiplication" methodology relies on two impossible variables. His first variable, "the number of individuals who have had their information collected via the [khaos ID]," is not capable of determination because khaos IDs have no ascertainable correlation to "individuals." *See supra* Part II.A. His second variable, statutory damages, is discretionary and "not to be awarded mechanically." *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268–69 (N.D. Cal. 2016) ("[M]any class members appear to have suffered little, if any, harm, such that a statutory damages award would be a disproportionate penalty."). And the available damages under CIPA are the *greater of* statutory damages *or* "three times . . . actual damages." Cal. Penal Code § 637.2(a). Plaintiff cannot simply forfeit the possibility of higher actual damages, as that would create a conflict between the named Plaintiffs and class members. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593–94 (2013).

For the remaining claims, Plaintiff vaguely suggests that the class "writ large" is owed "the money Magnite makes from secretly collecting Class members' information without consent[.]" Mot. 14. Plaintiff proposes no methodology to calculate the total or the distribution of damages at all, ignoring *Comcast*'s clear instruction. *See Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*, 2019 WL 1170489, at *5 (N.D. Cal. Mar. 13, 2019) (denying certification where "[i]n seeking disgorgement of Expedia's profits, the Plaintiffs failed to proffer a model or a legitimate theory for how those damages would be estimated, let alone disseminated among class members").

**7. Plaintiff's nationwide classes should not be certified because state-by-state differences in law predominate.**

Plaintiff proposes a nationwide invasion of privacy class. SAC ¶ 133.[14] But California law can apply nationwide only if "the interests of other states are not found to outweigh California's interest in having its law applied." *Mazza*, 666 F.3d at 590 (citation omitted). Plaintiff has not met his burden to establish through a choice of law analysis that other states' laws are sufficiently analogous to California law to justify a nationwide class.

The differences between California and other states' treatment of intrusion upon seclusion proliferate. For example, Florida requires an intrusion into a "private place," unlike California, which only requires intrusion into a "private activity"—a distinction that is meaningful in a case involving online activities. *Katz*, 668 F. Supp. 3d at 947. Meanwhile, "New York has consistently refused to recognize a common law right of privacy, and hence there is no cause of action of intrusion upon seclusion under New York law." *Joiner v. NHL Enters., Inc.*, 2025 WL 2846431, at *10 (S.D.N.Y. Aug. 29, 2025) (citations omitted), *report and recommendation adopted in part*, No. 23-CV-2083 (LAK), 2025 WL 3126106 (S.D.N.Y. Sept. 29, 2025). Virginia also does not recognize the tort, North Dakota "has not yet recognized whether [such] a tort action exists," and the laws of other states have "differences in the kinds of scienter required and the types of injury which must be suffered" to state a claim under intrusion upon seclusion. *Opperman v. Path, Inc.*, 2016 WL 3844326, at *9 (N.D. Cal. July 15, 2016).

Plaintiff counters that the laws of 39 states are similar because they all follow the Restatement. Mot. 11. But that proves the point: 11 states do not follow the

---

[14] Plaintiff no longer seeks to certify a nationwide unjust enrichment class. *See* Mot. 12 n.25; *see also Stitt v. Citibank*, 2015 WL 9177662, at *4 n.4 (N.D. Cal. Dec. 17, 2015) ("No court in this Circuit has certified a nationwide unjust enrichment class since [the Ninth Circuit decision in] *Mazza*.").

Restatement. And while Plaintiff asserts that courts routinely certify nationwide invasion of privacy classes, his examples are misleading. The defendants in *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574 (N.D. Cal. 2025) and *Rodriguez v. Google LLC*, 2024 WL 38302, at *3 (N.D. Cal. Jan. 3, 2024), did not argue against certification based on choice of law; the plaintiff in *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022 (N.D. Cal. 2019), proposed a "34-state class" where the states *did*[15] *all* follow the Restatement; and the class members in *Opperman*, 2016 WL 3844326, agreed to a contract that included a California choice-of-law provision.

Applying California law nationwide is thus inappropriate. Each state "has an interest in applying its law to transactions within its borders," and applying California law nationwide would impair other states "in their ability to calibrate liability to foster commerce." *Mazza*, 666 F.3d at 593.

**E. A class action is not "superior" under Rule 23(b)(3).**

Certification should be denied if proceeding as a class would not be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). That is so where a case is unmanageable. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127–28 (9th Cir. 2017). And this case would be the very definition of unmanageable because Magnite has no way of determining whether a class member's "personal information" was ever made available through its platform. *Mickelonis v. Aspyr Media, Inc.*, 2025 WL 1605332, at *11 (C.D. Cal. May 16, 2025) (Court, J.) ("[M]anagement of the class-action would be a 'pipe dream'" because there was "no good way to identify" who was in the class), *reconsideration denied*, 2025 WL 3050061 (C.D. Cal. July 11, 2025).

## V. CONCLUSION

The Court should deny Plaintiff's Motion.

---

[15] *Compare* 385 F. Supp. 3d at 1031 n.2, *with* Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3440 (2015).

**Certificate of Compliance**

The undersigned counsel of record for Magnite, Inc. certifies that this brief is 25 pages, which complies with the page limit outlined in Judge Court's standing orders in this matter, ECF No. 12, Section 6(c), superseding the word limit outlined in Local Rule 11-6.1.

Dated: May 22, 2026

**PERKINS COIE LLP**

By: */s/ Nicola C. Menaldo*

Nicola C. Menaldo, *pro hac vice*
NMenaldo@perkinscoie.com
Anna Mouw Thompson, *pro hac vice*
AnnaThompson@perkinscoie.com
Jordan C. Harris, *pro hac vice*
JordanHarris@perkinscoie.com
**PERKINS COIE LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: 206.359.8000
Facsimile: 206.359.9000

Alisha C. Burgin, Bar No. 286269
ABurgin@perkinscoie.com
**PERKINS COIE LLP**
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for Defendant Magnite, Inc.